# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CC-01115-SCT

*GRAND CASINO BILOXI*

*v.*

*DAVID HALLMARK*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 06/21/2000 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KATHRYN H. HESTER |
| | KEITH R. RAULSTON |
| ATTORNEYS FOR APPELLEE: | T. ROE FRAZER, II |
| | WARREN LEON CONWAY |
| | JOHN GORDON SIMS, III |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 08/29/2002 |
| MOTION FOR REHEARING FILED: | 11/14/2001 |
| MANDATE ISSUED: | 9/5/2002 |

**EN BANC.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is denied. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2. On December 3, 1997, David Hallmark filed a Petition for Investigation with the Mississippi Gaming Commission (Commission) disputing Grand Casino Biloxi's (Grand Casino) refusal to award Hallmark an alleged jackpot. The Commission concluded that he had not won the primary progressive jackpot because the machine had "entered a tilt condition and ceased to function." On January 15, 1998, Hallmark filed a Petition and Application for Hearing. The hearing was conducted on March 30, 1998, through April 3, 1998. On July 29, 1998, the hearing officer affirmed the decision of the enforcement agent and ruled that Hallmark did not win the jackpot.

¶3. Thereafter, on August 7, 1998, Hallmark requested a review of the hearing officer's decision by the Commission. On September 15, 1998, the Commission adopted the hearing officer's decision. On October 6, 1998, Hallmark appealed to the Circuit Court of the Second Judicial District of Harrison County. On

June 21, 2000, the circuit court reversed the decision of the Commission and awarded Hallmark the $509,000.00 jackpot. Following entry of the circuit court judgment, Grand Casino filed a notice of appeal to this Court. We affirm the decision of the circuit court.

## FACTS

¶4. On November 16, 1997, Hallmark went to Grand Casino Biloxi and played the Grand Bucks slot machine. He pulled the slot machine lever and saw "Grand Bucks" with bells ringing, lights flashing, and a scale that showed the progressive jackpot at $509,000.00. Casino employees arrived at the scene and informed Hallmark that the machine had malfunctioned.

¶5. Believing he had won the progressive jackpot, Hallmark requested that the Mississippi Gaming Commission get involved in the dispute. Before Commission employees arrived, the machine was entered and manipulated by casino employees who testified that the reels were spun and removed from the machine. The circuit court found that because the machine had been manipulated, the agent for the Commission did not have the benefit of conducting an investigation on the machine as it existed directly after the alleged jackpot. Also, on the same night as the dispute arose, a casino employee recorded over several relevant segments of video which showed footage of the events that took place as the casino employees were running tests on the slot machine in question. In addition, 15 other camera angles were erased or recorded over; therefore, the Commission and Grand Casino no longer had this evidence to assist in the final determination of the case. The casino also failed to preserve the custom buffer "cus buf" report which would have indicated every opening of the slot machine door, tilt conditions, jackpots, and other relevant information.

¶6. Based upon information provided by casino employees and information under the control of the casino, the agent for the Commission determined that the slot machine was in a tilted condition at the time Hallmark was playing it; therefore, Hallmark did not win the jackpot. After a subsequent investigation and a hearing, the Commission determined that Hallmark did not win the jackpot. The circuit court reversed the decision of the Commission. The circuit court determined that Hallmark's due process rights were violated because of Grand Casino's destruction of relevant evidence and the Commission's failure to conduct a proper investigation. This Court agrees with the circuit court's determination that Hallmark's due process rights were violated.

¶7. Grand Casino discusses in the body of its brief the following issues: due process; notice and an opportunity to be heard; the circuit court rejected the Commission's expertise; the record does not support the circuit court's finding of unfairness; and the record evidence supports the hearing officer's findings and conclusions. The circuit court did not reverse the Commission's determination on substantial evidence grounds, rather that court reversed on constitutional provisions, specifically the right of due process. The main focus of the circuit court concerned the prompt notification of a patron dispute to the Commission; proper preservation of evidence of the alleged jackpot; the investigation; and adherence to the gaming regulations. These issues can properly be considered as due process considerations. Based on several due process violations, the circuit court reversed the finding of the Commission and found in favor of Hallmark.

## DISCUSSION

¶8. Pursuant to Miss. Code Ann. § 75-76-171(3), a reviewing court may reverse a decision of the Mississippi Gaming Commission when the substantial rights of the petitioner have been prejudiced due to a

"violation of constitutional provisions." Miss. Code Ann. § 75-76-171(3)(a). The combined conduct of Grand Casino in its manipulation of evidence and of the Commission in its subsequent investigation resulted in a violation of Hallmark's due process rights.

### I. WHETHER THE CIRCUIT COURT PROPERLY REVERSED THE HEARING OFFICER'S DECISION AND FOUND THAT HALLMARK'S DUE PROCESS RIGHTS WERE VIOLATED?

### A. WHEN THE DISPUTE OCCURRED, DID THE CASINO'S FAILURE TO IMMEDIATELY NOTIFY THE COMMISSION RESULT IN A DENIAL OF HALLMARK'S DUE PROCESS RIGHTS?

¶9. Miss. Code Ann. § 75-76-159 states that "(1) whenever a licensee refuses payment of alleged winnings to a patron, the licensee and the patron are unable to resolve the dispute to the satisfaction of the patron and the dispute involves: (a) at least Five Hundred Dollars ($500.00), the licensee shall immediately notify the executive director;" Miss. Code Ann. § 75-76-159(1). The circuit court found that, despite this mandatory requirement, Grand Casino employees refused to immediately notify the executive director that a dispute had arisen. At the hearing Hallmark testified:

> while I was sitting there and being told that this was a malfunction and that the machine wasn't working, somebody, a patron, whispered in my ear, have them call the Gaming Commission, which was the first I had ever heard you could do so. So I requested that they call the Gaming Commission.

The casino actually discouraged Hallmark from involving the Commission, telling him:

> well, we can do that, but we will have to post a guard at the machine and close the machine. Your credits will be tied up in the machine until they make a decision. And I said, well let's call the Gaming Commission. Well, they will tell you the same thing that we told you, that it malfunctioned. Let's hear it from them. Let's call them.

¶10. Testimony revealed that the casino employees were well aware of the notice procedure that they are required to follow in the event of a disputed jackpot in excess of $500.00. Robert Payne, the investigating agent for the Commission, arrived on the scene about 2 hours after the dispute arose. The casino states that Agent Payne arrived at the casino approximately an hour *after he was called* to the casino.

¶11. The casino claims that it notified the Commission when the casino determined the combination of Hallmark's machine, refused to pay Hallmark for a non-winning combination and the casino could not resolve a disagreement with Hallmark. Immediate notification of the Commission is intended as a protection for the patron, as well as the casino. The dispute arose as soon as the first casino employee questioned whether Hallmark had won the jackpot after Hallmark had an expectation that he had won. The casino tested the machine and altered the evidence without any direction or guidance from the Commission. The condition of the machine was not preserved before the Commission agent arrived. Hallmark was told that if they notified the Commission, the machine would have to be locked down. He insisted that the casino notify the Commission. Instead of locking down the machine to preserve evidence, the machine was altered. Notice to the Commission at this point in time afforded no substantive due process protection to Hallmark.

¶12. In ***Mississippi Gaming Comm'n v. Freeman***, 747 So. 2d 231, 244 (Miss. 1999), this Court stated that, according to the notice provision, "where the dispute involves $500.00 or more, the casino is required

to immediately notify the executive director of the commission." Although it was clear in *Freeman* that the licensee failed to notify the commission, the difference between *Freeman* and the instant case was that according to testimony and the surveillance tapes, the patron did not appear to dispute the casino's explanation. In the case sub judice, any surveillance tapes that might have supported Hallmark's position on this issue were destroyed. Furthermore, the record clearly indicates that Hallmark did dispute the casino's explanation. The record suggests that Hallmark had to insist that the casino call the Commission. The record indicates that the dispute was immediate, but the casino did not involve the Commission until the tangible evidence was spoiled.

¶13. Another distinguishing factor in *Freeman* is that there *was* enough evidence in that case to conclude that the patron did not win the jackpot. The hearing officer had the opportunity to review the surveillance tapes, as well as a computer printout, which showed there was a "hopper jam," which is equivalent to a tilt. Due to the casino's own actions, this type of evidence was not available to the hearing officer in the case sub judice. Similar evidence used in *Freeman* was simply not available in the case sub judice. Again, it was destroyed or manipulated beyond preservation.

¶14. Unwisely, the same precautions that this Court laid out in *Freeman* were completely ignored in this case. This Court in *Freeman* noted that the several procedural errors and coincidences were suspicious. This Court suggested the following:

> (1) requiring casinos to "lock down" (remove from further play) a slot machine which is involved in a casino patron dispute until such time as a Commission agent can investigate; and (2) requiring casinos to immediately notify the Commission and to inform patrons of their rights any time any type of dispute is had with a patron regardless of whether it appears the patron has been satisfied.

*Id.* at 247.

¶15. In *Sengel v. IGT*, 2 P.3d 258 (Nev. 2000), a similar patron dispute case, Sengel disagreed with a casino employee over an alleged jackpot win and alleged malfunction of the machine by the casino. The Nevada Gaming Control Board was contacted immediately and a "thorough investigation" ensued immediately following the dispute. *Id.* at 260. The instant case is set apart from *Sengel* because in *Sengel* no issue existed as to whether the evidence was manipulated before the Board conducted its investigation; there was no issue as to whether failure to properly notify the Board resulted in a deprivation of due process of law. Unlike *Sengel*, the instant case involves an issue regarding the obstruction by the casino of a fair and independent investigation by the Commission. Furthermore, remaining evidence that was apparently under the Board's control in *Sengel*, during its immediate investigation, indicated that no jackpot lights were on, no sirens or music came from the slot machine, and the progressive jackpot amount continued to run. *Id.* at 259. On the other hand, in the instant case, the evidence for the casino, which consisted of testimony of casino employees, revealed that sounds came from the machine and lights were on. Notwithstanding casino employee testimony as to the alleged tilt condition, there remained a strong impression and expectation on Hallmark, his wife, and on at least one spectator that he had won the jackpot. Unfortunately, the subsequent manipulation of evidence by the Casino before the arrival of the Commission, along with the Commission's flawed investigation, wiped out all the clear evidence that would have readily resolved the dispute.

¶16. Preservation of the evidence is paramount to providing proper notice. This Court finds that Hallmark's due process rights were violated due to the casino's failure to render immediate and meaningful notice to the

Commission.

¶17. Member casinos of the Mississippi Gaming Association have expressed some concern that shutting down a casino gambling machine after every dispute over $500.00 will cause the casinos in Mississippi to lose revenue and cause a disruption in the casino industry. They argue that there are not enough gaming agents in Mississippi to promptly resolve disputes over slot machine jackpots and that roping off machines to wait for agents will cause a disruption in the gaming industry. However, securing safeguards for patrons is a public policy concern; the cost of roping off one machine, until the dispute can be adequately investigated by an unbiased party, is not significant enough for casinos to overlook the legislative safeguards and notice requirement intended to protect both parties to the dispute.

### B. DID THE INVESTIGATION BY THE COMMISSION RESULT IN A DENIAL OF HALLMARK'S DUE PROCESS RIGHTS?

¶18. The casino argues that under the Gaming Operations Manual, the agent is only required to ask the patron to put his complaint in writing, to go to the casino, to review the surveillance tapes, and to interview the patron and casino management. Additionally, the manual states that the agent can interview other witnesses and obtain computer print outs of slot machine activity if the agent deems them necessary. According to the casino, the agent's investigation was complete. On the contrary, because the casino failed to preserve tangible and unaltered evidence, the subsequent investigation could not have been conclusive or complete. The little evidence that remained consisted of the statements of casino employees and a dubbed video. The destruction of evidence prejudiced Hallmark's due process rights.

¶19. Agent Payne spoke with Hallmark and several of the casino employees, but failed to document any of the conversations. Although he testified that he spoke with Hallmark, and several Grand Casino employees, he failed to document these conversations in any way. Agent Payne also failed to take any physical evidence or to view the videotape of the event while he was at the casino that evening.

¶20. When Agent Payne arrived at the scene, he performed various tests on the machine. We are in agreement with the finding of the circuit court that these tests were meaningless because the machine had been entered and manipulated by Grand Casino employees before Agent Payne arrived on the scene. Casino employees testified that the reels were spun and at some point even removed from the machine before Agent Payne arrived. As such, any tests that were performed on the machine are tainted and the hearing examiner should have afforded them no weight at all.

¶21. The gaming agent did not have the benefit of conducting an investigation on the machine as it existed directly after the jackpot. Therefore, the evidence that existed on the machine at the time of the alleged winning, including the disputed combination pay line symbols and the alleged tilt condition, was altered forever.

¶22. In addition, Agent Payne was not aware that the casino employees had entered the slot machine on the night of November 16, 1997, prior to his arrival. Agent Payne stated that it is general knowledge that casino employees go into machines and even test them or shut them down if there is a patron dispute. However, it must be noted that Agent Payne relied on the information provided by and under the control of the casino in his investigation. As a result, his investigation, to a large extent, was only as good as the information released by the casino. Therefore, the circuit court's determination that Agent Payne's investigation was improper was not solely due to his failure to perform his duties. A more accurate view of the situation is that

Agent Payne's investigation was problematic due to the actions taken by the casino in the course of events surrounding the jackpot dispute.

¶23. Furthermore, the circuit court found that Agent Phil Hancock, who subsequently took over the investigation of Hallmark's case in mid December, also did not have the information that he would have had if a proper investigation had been conducted and had evidence been preserved on the date of the incident; as such, both Agent Payne's and Agent Hancock's investigations were fatally flawed and in violation of Hallmark's right to due process. Agent Hancock testified that he reviewed the dubbed video tape but found it was *not helpful* for determining if the machine was in a tilt condition. The circuit court determined that the investigation was inconclusive due to the lack of the videotape, reliance upon casino employee statements only, and a jackpot signal which had no supporting documentation.

¶24. The casino claims that the Commission investigation was not fatally flawed. The Legislature mandates that the executive director or his designee conduct an investigation that he deem necessary; therefore, the casino claims that, as such, the agent conducted the necessary investigation. The casino states that the agent arrived less than 55 minutes *after notification* and not two hours later as the circuit court found. Agent Payne conducted an investigation in which he performed four slot machine tests (last five games, slot machines were aligned properly, slot machine paying appropriate amounts, and slot machine was accepting coins properly); and checked the slot machine computer board for game tampering. The test results revealed that of the last five games only one winning combination of ten coins; the reels were properly aligned; the machines were paying the appropriate amounts, and the computer game board was intact with no indication of tampering. Agent Payne spoke to Hallmark and asked for statements from casino employees only. Agent Payne reviewed the surveillance tape and received a copy of the MEAL log. Agent Payne told Hallmark there was a reel tilt with no jackpot.

¶25. The circuit court's main focus concerning the investigation was the lack of all evidence by either destruction of evidence, a time delay in the investigation, and the mere reliance upon only the unsigned statements of casino employees. Hallmark spoke to Agent Payne but did not give any written statement for investigation purposes to either agent. The Commission did not request Hallmark's written statement of the events even though statements from casino personnel were requested by the agents.

¶26. All of the casino's arguments aside, this Court finds that Hallmark's substantial rights were prejudiced due to the denial of due process of law. Evidence that would have been helpful to the jackpot incident and assisted the agents in their investigation was not preserved due to the casino's actions. In addition, such evidence was not available upon review. The casino had control and possession of the majority of the evidence and had the responsibility to preserve that evidence. Any subsequent investigation was meaningless. Grand Casino's failure to preserve the evidence and the Commission's investigative technique, in relying on tainted evidence, contributed to the denial of Hallmark's right to due process.

### C. DID THE FAILURE TO PRESERVE EVIDENCE PREJUDICE HALLMARK'S RIGHTS?

¶27. The circuit court stated that the casino employee's act of destroying part of the casino videotape violated gaming regulations, and the deliberate destruction of the tape violated Hallmark's due process rights. In addition, the investigating agents and the hearing officer did not have the benefit of a recording of the entire sequence of events.

¶28. Mississippi Gaming Regulation Section 10 (e) states that :

> Every licensee must retain all videotape recordings for at least ten (10) days after the recording is produced, unless a longer time period is required by another section of this regulation, or by order of the Executive Director, the commission, or a court of competent jurisdiction.

¶29. The casino has approximately seven minutes of tape beginning at the time Hallmark walked up to the machine to shortly after the lights began flashing on the machine and Hallmark allegedly won the progressive jackpot. The time was approximately 2:14 a.m to 2:22 a.m. There is no videotape of the subsequent actions taken by casino employees to investigate whether there was an alleged winning of the progressive jackpot or an alleged machine tilt.

¶30. The casino claims that the original surveillance tape, from which the copy was made for the Commission, was held for the required time period under the gaming regulations. III.F.7(a). The tape was then returned to the normal inventory for use in taping other casino events. The casino states that Agent Payne viewed the original tape with Brown, the surveillance supervisor, while at the casino. Although, according to the record, its not clear that Agent Payne reviewed the tape that night. The hearing officer had an opportunity to examine a copy of the tape and see the sequence of the flashing lights on Hallmark's machine. However, Agent Hancock testified that he *could not* determine the sequence of flashing lights from the videotape. The casino claims that the sequence of the flashing lights indicated a reel tilt and a door open, and any claim to the contrary is not supported by fact or evidence.

¶31. The cross-examination of Bill Brown, the surveillance supervisor at the casino on November 16, 1997, regarding the videotape, was as follows:

> Q. Now, why did you stop the tape?
>
> A. Just now or - -
>
> Q. No. The tape says, at 2:22 tape stopped, doesn't it?
>
> A. Yes.
>
> Q. Who made that decision?
>
> A. I did.
>
> Q. You made it?
>
> A. Yes, sir.
>
> Q. Now this little surveillance report that somebody filled out that was sitting next to you went on beyond 2:22, didn't it?
>
> A. The report goes on beyond that, yes, sir.
>
> Q. Where do you have it with you on any tape showing what happened at that machine after 2:22?
>
> A. I don't have anything with me on the tape, no, sir.

Q. Where is it?

A. We don't have it.

Q. What do you mean you don't have it?

A. I mean there's no tape that has it.

Q. So you just quit filming at 2:22?

A. No, sir.

Q. What happened at 2:22?

A. That's when I quit dubbing the tape.

Q. So there was of this area, out of the camera view that we have just viewed, was still being filmed at 02:22:01?

A. Yes, sir.

Q. And 2:23?

A. Yes, sir.

Q. And 2:30?

A. Yes, sir.

Q. 2:48?

A. Still today.

Q. 4:20?

A. Yes, sir.

**Q. That's been destroyed, correct?**

**Ms. Hester: Objection.**

**A. Yes, sir.**

**Q. Well, it has been destroyed, hasn't it?**

**A. It's been taped over.**

**Q. You destroyed it. It's gone, correct?**

**A. Correct.**

**Q. And who made that decision?**

**A. I did.**

**Q. You made it?**

**A. Yes, sir.**

**Q. When did you make it, that night?**

**A. Yes, sir.**

**Q. Now, you knew that there was a dispute, correct?**

**A. I knew that there was a dispute at the time that we rerecorded the video, the dub that you saw**.

Q. Right. Now, so you knew there was a dispute, but you didn't keep what was on the tape past 2:22?

A. No, sir. At 5:10 when Agent Payne came up, the dispute, as far as I knew, was taken care of. There was no longer a dispute.

Q. Well, did you have the tape available then?

A. Yes, sir.

Q. Did you keep a copy of that?

A. There was no longer any dispute.

Q. From whose perspective?

A. From Agent Payne's.

Q. Not from Mr. Hallmark's?

(emphasis added). Brown also testified that the equipment used by the casino has a screen that shows all sixteen camera shots. However, Brown excluded the other 15 camera shots from the dubbed version of the videotape because he stated that it did not have any bearing on the issue.

¶32. Based on the testimony from the casino employee, a portion of the videotape was destroyed on the night of November 16, 1997. This portion of the tape would have preserved the actions taken by the casino and the Commission representatives involved in this case. The position of the portion of the preserved videotape did not show the pay line. In addition, the other 15 camera angles were not preserved either. The testimony given at the hearing did not indicate whether the other 15 angles were of benefit; nevertheless, any evidence of the subsequent actions of the casino employees and any differing camera views were not maintained. The patron, the Commission and the casino no longer had this evidence to assist in the final determination of the case.

¶33. This Court has held:

It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a

presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.

*Tolbert v. State*, 511 So.2d 1368, 1372-73 (Miss. 1987)(quoting *Washington v. State*, 478 So.2d 1028, 1032-33 (Miss. 1985)). As this Court stressed in a recent patron dispute case, *Freeman*, 747 So.2d at 247, "...patrons are at the mercy of [the] gaming system and the law, and the judicial system is their only current safeguard." Further, the statutes are designed to protect all parties involved in a dispute.

¶34. Grand Casino states that in *Thomas v. Isle of Capri Casino,* 781 So. 2d 125, 134 (Miss. 2001), this Court held that the negligent loss of evidence results in a permissible inference that the lost evidence would have been unfavorable to the party who lost the evidence. In that case, the hearing officer found that the presumption had been rebutted by other evidence. There are key differences in the *Thomas* case and the case *sub judice* that the casino fails to recognize. In *Thomas* there was sufficient evidence to find that the hearing officer's decision did "not meet the 'unsupported by any evidence' standard to require a reversal." *Id.* The evidence in *Thomas* consisted of slot tracking systems, experts to describe the functions of the machine in jackpot mode, and a surveillance tape, as well as several witnesses with conflicting testimony. Substantive evidence was not available in the case sub judice. The evidence in the case *sub judice* was spoiled or altered in such a way as to prevent a meaningful investigation. Furthermore, it *can not* be said that in the present case the casino *negligently* altered the machine and dubbed over the surveillance tape. On the contrary, the casino's actions were deliberate and intentional.

¶35. Besides failing to preserve the video tape and the condition of the machine, the casino also failed to preserve the custom buffer ("cus buf") report. The "cus buf" report shows all door openings, door closings, *jackpots*, *tilts*, etc. The computer buffer files have limited space, and once the files are full, the old data is deleted as more current data is generated. Williams, the director of slot machines, knew there had been a jackpot dispute with Hallmark and was aware of limited computer space in regard to the "cus buf" report. Yet, the report was not generated. Consequently, the message that the computer would have received from Hallmark's machine at the time of his play was lost. If the machine had been intact and not altered, the alleged tilt code could have been verified by the Commission or verified against the computer cus buf report, if the report had been preserved by the casino.

¶36. The circuit court also cited that a time delay severely compromised the investigation that followed and violated Hallmark's due process rights. Agent Hancock was assigned the case in mid December after the Commission received a Petition for Investigation from Hallmark's counsel. The circuit court stated that the Commission should have conducted the investigation immediately after the dispute arose. Hallmark had to hire an attorney and file a petition for the investigation.

¶37. Clearly, a delay of one month by the Commission, severely inhibited the investigation. The machine, of course, was not in the same position; the videotape was not complete; some computer reports were not still available; the events were not as fresh in the minds of the witnesses; and some witnesses, such as other patrons, were not questioned. Furthermore, a different agent was assigned the case, and he was not as familiar with the surrounding events.

¶38. Grand Casino failed to follow procedure and deliberately spoiled tangible evidence. The remaining evidence was necessarily inconclusive. Due to the failure to afford Hallmark due process of law, in light of

the casino's failure to preserve the evidence and to follow proper procedure, a decision by the Commission in favor of the casino would be inappropriate.

¶39. The casino had all the pertinent evidence under its control and in its possession. Yet the casino failed to preserve all evidence surrounding the alleged jackpot, such as the entire videotape of all events concerning the patron dispute. The patrons in these instances are truly at the mercy of the casino, which has control over much of the potential evidence in a patron dispute case. Therefore, the circuit court correctly determined that based on a review of the record, Hallmark's substantial rights were prejudiced.

¶40. The dissent states that this Court has cited no legal authority to support the conclusion that Hallmark was denied his due process rights. Although this is a case of first impression, the legal authority that allows this Court to protect the substantive due process rights of patrons rests in Miss. Code Ann. § 75-76-171(3)(a). Furthermore, the procedural notice requirement, under Miss. Code Ann. § 75-76-159(1), was intended to protect the patron and the casino by allowing a non-biased party, the Commission, to determine and judge disputes such as this one. The only evidence not in the control of the casino included: a machine in its original condition, the "cuss buf" report, surveillance videos, third parties, etc. Before the Commission had the opportunity to evaluate this evidence, it was altered or destroyed. The dissent sets forth a list of evidence that it contends clearly indicates that Hallmark did not win the jackpot. However, all of this evidence remained under the control of the casino throughout the investigation.

## II. WHETHER THE CIRCUIT COURT ERRED IN REVERSING THE HEARING OFFICER'S DECISION?

¶41. The circuit court reversed the decision of the hearing officer and entered a judgment in favor of Hallmark in the amount of $509,000.00 with court costs.

¶42. Miss. Code Ann.§ 75-76-171(3) states the following:

The reviewing court may **affirm the decision and order** of the commission, **or** it may **remand the case** for further proceedings **or reverse the decision** if the **substantial rights of the petitioner have been prejudiced** because the decision is:

(a) In violation of constitutional provisions;

(b) In excess of the statutory authority or jurisdiction of the commission;

(c) Made upon unlawful procedure;

(d) Unsupported by any evidence; or

(e) Arbitrary or capricious or otherwise not in accordance with law.

(emphasis added). Additionally, Miss. Code Ann.§ 75-76-173 states:

1. Any party aggrieved by the final decision in the circuit court after a review of the decision and order of the commission may appeal to the Supreme Court in the manner and within the time provided by law for appeals in civil cases. The Supreme Court shall follow the same procedure thereafter as in appeals in civil actions **and may affirm, reverse or modify the decision as the record and law warrant**.

2. The judicial review by the circuit and Supreme Courts afforded in this chapter is the exclusive method of review of the commission's actions, decisions and orders in hearings held pursuant to Sections 75-76-159 through 75-76-165, inclusive.

(emphasis added).

¶43. Miss. Code Ann. § 75-76-171(3) clearly allows the circuit court to reverse a commission decision if the substantial rights of the petitioner have been prejudiced, such as in the case sub judice, where the decision by the Commission violated Hallmark's due process rights. On appeal this Court may either affirm, reverse or modify the decision as the record and law warrant. Id. § 75-76-173. The present case cannot be remanded for a new hearing since the evidence is no longer in existence. The casino had control and possession of the information and yet, failed to preserve relevant evidence in violation of gaming regulations. Consequently, the appropriate remedy in this particular case is to affirm the circuit court's judgment in favor of Hallmark in the amount of $509,000.00 with costs.

## CONCLUSION

¶44. This Court's primary concerns are the casino's manipulation of the machine and destruction of evidence to the point where no Commission agent could make a proper determination of whether there was a jackpot. The Commission had to rely solely on the casino's own investigation. Without preservation of the evidence, there would be no point in calling the Commission and no point in having a notice provision. The notice provision would provide little or no protection to the patron. The gaming act was designed to protect casinos as well as patrons. When Grand Casino failed to immediately notify the Commission and failed to preserve evidence, the casino not only spoiled any evidence that Hallmark may have used to support his claim but also ridded itself of any evidence that may have threatened its own interest. For these reasons, the judgment of the Harrison County Circuit Court is affirmed.

¶45. **AFFIRMED.**

**PITTMAN, C.J., McRAE, P.J., EASLEY AND GRAVES, JJ., CONCUR. SMITH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, COBB AND CARLSON, JJ.**

**SMITH, PRESIDING JUSTICE, DISSENTING:**

¶46. The majority concludes that the decision of the Gaming Commission that Hallmark did not win the jackpot violated his due process rights. The majority forces a casino to hand over alleged winnings to a gaming patron that were never won, despite overwhelmingly clear evidence of a machine malfunction and not a jackpot. In doing so, the majority epitomizes the catch phrase "jackpot justice," and makes it clear that such ridiculous awards have unfortunately become the price of doing business in this State. In my view, the circuit court erred in reversing the determination of the Commission. Because this Court affirms the circuit court, I respectfully dissent.

¶47. The majority correctly observes that in reviewing the decisions of the Commission the circuit court and this Court, are limited to the deferential standard of review of findings of an administrative agency as stated in Miss. Code Ann. § 75-76-171(3) (2000). Our function is to review the evidence presented to the Commission to determine if the decision violated any constitutional provisions. *Id.*

¶48. In affirming the judgment of the circuit court, the majority finds that the reasoning of the circuit court is appropriately based on a decision that the Commission's decision violated Hallmark's due process rights. The majority ignores the fact that the circuit court adopted, virtually verbatim, Hallmark's findings of fact and conclusions of law from his brief to that court. We approach such a review with caution. This Court analyzes such findings with greater care, and the evidence is subjected to heightened scrutiny. *Brooks v. Brooks*, 652 So. 2d 1113, 1118 (Miss. 1995) (citing *Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 83 (Miss. 1992); *In re Estate of Ford*, 552 So. 2d 1065, 1068 (Miss. 1989)).

¶49. On rehearing, the majority claims that Hallmark's due process rights were violated in the present case, yet they cite to no legal authority for this conclusion. Previously, the majority held that the Commission's decision was merely arbitrary and capricious and virtually ignored the due process claims. In fact, on rehearing the majority has merely substituted two words, i.e. "due process" in what is otherwise the same opinion. On rehearing the majority has compounded the problem as the majority opinion is worst now than was the original. The majority claims to be addressing this issue, first impression. This is simply not so. Rather, the majority is ignoring our applicable case law. This Court has stated:

> [A]n administrative board must afford minimum procedural due process under the Fourteenth Amendment to the United States Constitution and under Art. 3, § 14 of the Mississippi Constitution consisting of (1) notice and (2) opportunity to be heard.

*Mississippi Gaming Comm'n v. Freeman*, 747 So. 2d 231, 246 (Miss. 1999) (citations omitted). Further, "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. The majority cites no instance where Hallmark was denied this right. As we noted in *Freeman*, Hallmark had "ample opportunity to put on all the testimony and evidence which [he] desired."*Id*. at 245.

¶50. The circuit court held that Grand Casino and the Commission deprived Hallmark of due process rights by, basically, destroying evidence and conducting an inadequate investigation. The majority has likewise so held. The Commission is not a party to this action. Contrary to the majority's claim, we addressed a deprivation of due process claim in *Mississippi Gaming Comm'n v. Freeman*, 747 So. 2d 231 (Miss. 1999). There we held that the appropriate remedy for a due process violation by the Commission is disciplinary action pursuant to Miss. Code Ann. §§ 76-76-103 through 75-76-119, not awarding jackpot winnings which the overwhelming evidence shows the patron did not win. *Id.* at 244. Further, the record does not support such a conclusion. To the contrary, the record indicates that the decisions of the hearing examiner and the Commission were well reasoned and thoroughly supported by the evidence. Though arguably, as in *Freeman*, it may be said that the Commission could use more solid investigatory techniques, such a fault lies with the Commission, the remedy for which lies not, as we stated in awarding a jackpot where clearly none was won.

¶51. The majority contends that there was enough evidence in *Freeman* to conclude that there was no jackpot, yet suggests that is not so in the case below finding that surveillance tapes and computer printouts were unavailable . (Maj. Op.¶¶ 13-14 ). In the present case, there is video of the alleged "winning play." This was not so in *Freeman*. Also, the computer printout regarding progressive jackpot figures showed that no jackpot had been won on that day. The majority also makes much of the fact that the lights and sounds emanating from the machine gave Hallmark and his wife the impression that he had won the jackpot. This finding is especially egregious where all expert and knowledgeable employees testified that the lights

and sounds were indicative of a "tilt" condition, not a jackpot. It is a sad day when this Court awards a jackpot simply because the patron *thought* he won it-truly giving a new meaning to "jackpot justice." Decisions like this will have plaintiffs and their lawyers lining up at the courthouse steps.

¶52. The majority concludes that "Hallmark's due process rights were violated due to the casino's failure to render immediate and meaningful notice to the Commission." (Maj. Op. ¶ 16). However, it cites no legal authority for this conclusion. Rather, it states that casinos have noted concerns about roping off machines from play when there is a dispute. However, the statute governing this situation states that:

> ***Whenever a licensee refuses payment of alleged winnings to a patron***, **the licensee and the patron are** *unable to resolve the dispute to the satisfaction of the patron* **and the dispute involves:**
>
> (a) At least Five Hundred Dollars ($500.00), the licensee shall immediately notify the executive director; or...

Miss. Code Ann. § 75-76-159 (emphasis added). Only 26 minutes expired between knowledge of the dispute and the notice to the Commission and within 2 hours a Commission agent was on the scene. In its holding, this Court has successfully superseded the power of the Legislature and rewritten the law. I would note that while ***Freeman*** presented a slightly different issue, in that Freeman did not notify the casino of her dissatisfaction with their resolution, this Court noted no error with the fact that a casino employee entered the machine to see what the problem was.

¶53. The majority also opines about the lack of evidence available for review by the Commission. This is ridiculous! There was overwhelming evidence presented. The hearing examiner in this case conducted a five-day trial. Needless to say, the record is voluminous. The hearing examiner concluded that the slot machine's bill validator door came open during play, causing the machine to stop, which meant that the reels failed to index properly and tilted. The game was interrupted until the machine was cleared, and the game resumed when the door was closed. The result of the completion of play was a losing combination.

¶54. The only testimony supporting the allegation that Hallmark won the $509,000 jackpot is that of Hallmark and his wife. It is clear that Hallmark and his wife believed he had won the jackpot. The candle on the machine began flashing, bells or tones sounded, the reels showed a winning combination, and surrounding patrons began offering their congratulations. To the layman, such could only mean Hallmark had won.

¶55. Hallmark at all times maintained that he had won the progressive jackpot of $509,000. The only testimony at trial that the reels stopped on the winning combination for the progressive jackpot, three "grand bucks" symbols centered on the payline, was that of Hallmark. All eyewitnesses testified that the reels stopped with the "grand bucks" symbols centered on the payline on the first two reels and the "grand bucks" symbol just above the payline on the third reel. It is undisputed that such a combination indicates a nonprogressive jackpot of $20,000. Nevertheless, all employees of the casino and expert witnesses called at the hearing testified that regardless of what the symbols on the reels showed, if the a tilt had occurred, no jackpot was won. Hallmark has not testified that any employee of the casino informed him he had won a jackpot-progressive or nonprogressive.

¶56. Five eyewitnesses, all casino employees, testified that Hallmark did not win a jackpot, but rather the

machine experienced a malfunction termed a "41 tilt." Three experts on slot machines concluded that Hallmark did not win the jackpot, and their testimony regarding the mechanics of slot machines went uncontested. It was suggested by Hallmark's counsel that the testimonies of the adverse witnesses, as employees of the casino, were biased. The evidence showed, however, that, as required by the regulations of the Gaming Commission, the casino is not entitled to the money from the progressive jackpots. The money can only be awarded to patrons. In fact, the testimony showed that the Casino benefits from good publicity when jackpots are won.

¶57. Even the purely objective evidence at trial showed that the "behavior" of the machine, which Hallmark interpreted as a jackpot, was clearly a malfunction:

¶58. The machine played by Hallmark has a candle on top with two lights. The top light is a white light, and the bottom light is a blue light. When a jackpot is won, both lights flash simultaneously. The lights, however, do more than provide entertainment. They signal employees not only to jackpots, but also to malfunctions. The white light flashes when a tilt has occurred. The blue light flashes when a door on the machine is open. Both the white and blue lights were flashing on Hallmark's machine, but the two were not flashing together. Rather, the lights were flashing alternately. Eyewitnesses so testified, and this is shown on the surveillance video admitted at the hearing. The uncontested testimony at the hearing was that this is indicative of a reel tilt and an open door.

¶59. The marquee above the Grand Bucks machines displays the amount of the progressive jackpot. As games are played on the machines, the amount of the jackpot increments. When a jackpot is won, the jackpot amount on the marquee freezes, then automatically resets to the amount of $250,000 and begins incrementing again. Testimony at the hearing demonstrated that there cannot be a progressive jackpot without the jackpot being reflected on the marquee. As shown on the surveillance video admitted at trial, at the time of the incident in question, the marquee never stopped incrementing.

¶60. If a jackpot is won, the slot machine sends a signal to the slot dispatch office. No signal was sent to the dispatch office from Hallmark's machine. If the machine is reset without the jackpot being paid, the information will remain in the system. At the end of the month, the signals are compiled in a report for the finance department, which conducts an audit of slot activity. The report for November 1997 shows no jackpot for Hallmark's machine. The undisputed testimony showed that this information would be on the report even if employees had determined there was no jackpot.

¶61. Also, the progressive meter printout, which is also compiled by the finance department, is based on what the marquee above the progressive machines reads each day. On November 16, 1997, the amount on the marquee was $509,918.37. On November 17, 1997, the amount on the marquee was $510,034.40. Testimony at the hearing demonstrated that it was impossible for the machine to have re-set and the amount to have incremented from $250,000 to $510,034.40 in one day.

¶62. Five casino employees, all eyewitnesses to the incident in question, stated that the LED display on the machine showed an error code of "41," which indicates a tilt on the first reel of the machine.

¶63. The tests run by the employees at the time the machine was opened and also the tests run by Agent Payne show there was no jackpot on Hallmark's machine. The five game recall test, which shows the final reel combination for the last five games played on a machine, showed no jackpot, progressive or nonprogressive. Also, the results of the Kobitron test indicated that the computer chips in the slot machine

had not been tampered with.

¶64. The circuit court and the majority state that the tests run on the machine were meaningless because the employees had entered the machine and altered its condition prior to the time it was tested. This is both incorrect and absolutely impossible according to all experts who testified regarding the testing. The casino does not dispute the fact that its employees opened the machine, ran tests to determine the cause of the malfunction, physically spun the reels, and even removed the reels prior to closing the door and allowing the reels to complete their spin. There is no dispute regarding the actions of the employees, and all evidence offered at the hearing demonstrated that the actions taken by the employees were standard procedure.

¶65. The undisputed expert testimony at trial showed that the tests, spinning the reels, and taking the reels out of the machine can not affect the outcome of the game. The undisputed testimony showed that a slot machine contains a microprocessor which predetermines a randomly selected combination. The spinning of the reels is, in effect, for entertainment. There are grooves cut into each reel that are read by an optic as the reels spin. The reels index from left to right, one at a time. When each reel stops at the point predetermined by the microprocessor, the reels are said to have "indexed" properly. When a malfunction, also called a tilt, occurs, play is suspended, and the reels will stop. When a tilt occurs, the symbols on the reels do not correspond to the combination randomly selected by the computer. The tilt must be cleared before the reels will index. The microprocessor, not a casino employee, detects when a tilt has occurred. When the malfunction is cleared and the door to the machine is closed, play will resume and the reels will stop on the predetermined combination -- the combination determined by the microprocessor prior to the door to the machine ever having been opened. Experts Chris Surian and Frank Kennedy, as well as casino employees Sandra Head and Dee Kuehn, testified that absolutely no action taken by an employee while the machine is opened can alter the predetermined combination. Again, this testimony was undisputed.

¶66. The condition was easily replicated when the casino later tested the machine. The surveillance video shows that the tilt condition occurred when Hallmark pulled the lever on the machine hard and fast. Expert testimony at trial indicated that the bill validator door is controlled by a micro-switch, the optics for which will show the door as open when the machine vibrates. Surian testified that movement of even a 32nd of one inch would open the micro-switch. If the optics indicate to the machine that the door is open, normal play will be immediately interrupted and a tilt will occur. Surian replicated the condition after ten to fifteen hard pulls on the handle. Surian caused the machine to go into tilt code four times, and one time the reels on the machine tilted to a winning combination.

¶67. Also, as shown in the surveillance video, the lights on Hallmark's machine began flashing immediately when he pulled the handle. Bill Brown, surveillance supervisor for the casino, testified that when a jackpot is won, the lights begin flashing three to four seconds after the handle is pulled, after the reels have completed their spin.

¶68. Clearly, the hearing officer's determination was supported by the record. The majority erroneously finds that the alleged failure of the casino to follow gaming regulations and the Commission's lack of investigation mandate the conclusion that the Commission's decision violated Hallmark's due process rights. In truth and in fact, the casino followed gaming regulations, and the Commission conducted a proper investigation.

Patron Dispute

¶69. The majority finds that the Commission failed to comply with Miss. Code Ann. § 75-76-159(1), which provides:

> Whenever a licensee refuses payment of alleged winnings to a patron, the licensee and the patron are **unable to resolve the dispute** to the satisfaction of the patron and the dispute involves: (a) at least Five Hundred Dollars ($500.00), the licensee shall immediately notify the executive director.

(emphasis added). We addressed the failure of a casino to notify the Commission in *Freeman*, where we observed that Miss. Code Ann.§ 75-76-159(3) mandates that "[f]ailure to notify the executive director or patron as provided in subsection (1) is grounds for disciplinary action pursuant to 75-76-103 through 75-76-119, inclusive." *Freeman*, 747 So. 2d at 244. We stated that failure to notify does not entitle a patron to jackpot winnings which the evidence shows he or she did not win. *Id.*

¶70. Further, the record does not support the circuit court's and majority's conclusions that there was no prompt reporting of the incident regarding the casino's notification of the Commission. The record shows that Hallmark approached the slot machine at 2:15 a.m. and that the machine's lights came on at 2:17 a.m. Contrary to Hallmark's assertion that it took fifteen minutes for a casino employee to arrive at the machine, a casino employee arrived at the machine at 2:22 a.m., five minutes later. At 2:48, Head notified the surveillance department about the complaint, and the surveillance department notified the Commission. The agent returned the casino's call at 2:50 a.m. Thus, under the most liberal view of the evidence, there was at most a span of twenty-six minutes between the time a casino employee *possibly* knew the casino would not pay the alleged jackpot winnings to Hallmark and the time the Commission was notified and a Commission employee was on the scene within two hours. The record shows that during this time, the casino employees were attempting to determine whether the machine had malfunctioned and the cause of the malfunction. The testimony of all the employees involved indicates that they explained their actions to Hallmark prior to performing them and that Hallmark appeared satisfied with their explanations.

¶71. Significantly, the statute requires that the casino notify the Commission of the dispute when the patron and casino are unable to resolve the dispute, not when a dispute first arises. The majority claims the record reflects that Hallmark immediately disputed the casino's explanation. That is simply not true, the record reflects this is a disputed issue. The casino maintains that it notified the Commission once it was clear that Hallmark disagreed with its explanation. The record indicates that the Commission was notified as soon as it became clear that Hallmark disagreed with the casino employees' explanation of what had occurred - that is, when the reels completed their spin and the result was not a winning combination. This was the conclusion reached by the hearing officer.

¶72. The majority concludes that because the Commission was not contacted before the machine was opened, valuable evidence was lost and the investigation hindered. The majority, however, fails to state which evidence was lost and how the investigation was hindered. The uncontested expert testimony at trial demonstrated that opening the machine, testing the reels, spinning the reels, and even removing the wheels has absolutely no effect on the outcome of the game. The only dispute at trial which would have been aided by preservation of the machine in its condition at the time the alleged jackpot occurred was the dispute over whether the reels at that time indicated a $509,000 jackpot or a $20,000 jackpot. Nevertheless, the position of the reels is irrelevant where there is a machine malfunction and no jackpot at all. The hearing examiner found that the machine malfunctioned, and, as discussed previously, this finding is amply supported by the evidence.

<u>Destruction of Evidence</u>

¶73. The majority concludes that the casino violated gaming regulations by failing to preserve the entire videotape of all events surrounding the dispute. The majority states that the Commission did not have the benefit of viewing the subsequent actions taken by casino employees at the time of the dispute over the alleged jackpot.

¶74. Mississippi Gaming Regulation Section 10(e) states that:

> Every licensee must retain all videotape recordings for at least ten (10) days after the recording is produced, unless a longer time period is required by another section of this regulation, or by order of the Executive Director, the commission, or a court of competent jurisdiction.

¶75. There was no allegation or proof at trial that the Casino failed to retain the videotape in question for the requisite ten-day period. The supervisor of surveillance was questioned only regarding the copy of the tape he made on the night of the incident in question. He never testified and was never asked the length of time the original tape was retained before it was ultimately taped over, or, what the majority and circuit court term, "destroyed." The supervisor certainly never stated that the tape was destroyed or taped over on the night in question. It is clear that by the time the Commission began further investigation of the incident, the original tape was no longer in existence. However, Agent Hancock began his investigation more than ten days after the incident. The fact that the investigation began after the requisite ten-day retention period for videotapes is not due to any shortcoming, if at all, by the casino, only the Commission.

¶76. Besides, the entire video has not been destroyed. The video of the incident in question runs from the time Hallmark sat down at the slot machine to the time a casino employee approached the machine after the machine malfunctioned. The majority states that the portion of the tape after Hallmark won the alleged jackpot would have preserved the actions taken by the casino employees in this case. There is no dispute as to the actions taken by the employees. The employees admit that the machine was opened and tested and that the wheels were spun. Hallmark's testimony does not indicate otherwise. There is no dispute of fact regarding the actions of the employees which the video might help to resolve. Furthermore, it is doubtful that a tape of the subsequent events would have been helpful in light of the unrefuted testimony at trial that the subsequent actions taken by casino employees could not have altered the outcome of the game. More importantly, Bill Brown, surveillance supervisor for the casino who was responsible for making the tape of the incident, testified that though there are sixteen camera angles on the Grand Bucks machines, none were pertinent to the dispute and they were no closer in proximity to the machine than the tape admitted at trial. Brown stated that the camera directly behind the machine at the bar is pointed only at the bar's cash register.

¶77. The Legislature has seen fit to prescribe by statute the length of time surveillance tapes must be retained by a casino. In my view, the majority errs in extending that duty beyond what the Legislature has required, particularly in light of the fact that there has been no showing that the casino did not retain the tape in question for the required ten-day period.

¶78. The majority also criticizes the casino's failure to generate a customer buffer report, which would have shown the door openings and closings and a jackpot, if any, on the machine in question. Regardless of the existence of this report, there was overwhelming evidence, discussed previously, that a malfunction occurred on Hallmark's machine. Furthermore, the customer buffer report is not the only document

generated by the casino's computer system regarding slot machine activity. Admitted into evidence before the hearing officer was the slot dispatch report which shows all jackpots for the month of November 1997. No jackpot was shown on Hallmark's machine, and, had a jackpot been won, it would have been displayed on the report even if the casino and/or the Commission had determined there was no jackpot. There is no way to alter this, and the majority does not refute this evidence.

¶79. Further, the majority improperly makes its own finding of fact when it states that "Grand Casino failed to follow procedure and deliberately spoiled tangible evidence." (Maj. Op. ¶ 38). It also states that "it *can not* be said that in the present case the casino *negligently* altered the machine and dubbed over the surveillance tape. On the contrary, the casino's actions were deliberate and intentional." (Maj. Op. ¶ 34). There is no finding below that suggests any deliberate behavior by the casino, and thus the majority cites no specific fact to support its erroneous conclusion. Such language is made up and dicta at best. Again, the majority ignores legislative mandates and appropriate standards of review when it states that in ***Thomas v. Isle of Capri Casino***, 781 So. 2d 125 (Miss. 2001), there was sufficient evidence to find that the hearing officer's decision did "not meet the 'unsupported by any evidence' standard to require a reversal." (Maj. Op. ¶ 34). It then concludes that "[s]ubstantive evidence was not available in the case sub judice." (*Id*.). However, the evidence marched out by the majority from ***Thomas*** is "slot tracking systems, experts to describe the functions of the machine in jackpot mode, and a surveillance tape, as well as several witnesses with conflicting testimony." (*Id*.). The same categories of evidence in that short list are found in the case sub judice. In the case below, there is a progressive jackpot winnings report compiled by Grand Casino, and for the record, every casino participates in this progressive jackpot game. That report shows there was no jackpot won on that day, there were experts to explain the functions of the machine, there was a surveillance tape that captured the alleged "winning" jackpot and there were witnesses to the event. It defies logic for the majority to conclude that there was a lack of evidence below. Certainly it boggles the mind that the majority sees a denial of due process in this case. The majority here ignores the evidence, case law, statutes, commission regulations, and it appears totally result oriented. <u>Investigation</u>

¶80. The majority concludes that the tests conducted by Agent Payne on the slot machine were meaningless because the machine had been entered and manipulated by casino employees before Agent Payne arrived at the machine. The majority states that the casino employees deprived Agent Payne of the benefit of conducting an investigation on the machine as it existed directly after the jackpot. Again, the unrefuted expert testimony at trial demonstrated that the actions of the employees in opening the machine, testing the machine, spinning the reels, and closing the machine door could in no way alter the predetermined outcome of the game.

¶81. The majority concludes that the lapse of one month between the time of the dispute and the time Agent Hancock was assigned the case "severely inhibited" the investigation. The majority states that the machine was not in the same position, the video tape was not complete, some computer reports were not available, and events were not fresh in the minds of the witnesses. Again, any unreasonable delay in continuing its investigation of this matter was a shortcoming of the Commission, not the casino, the remedy for which is not awarding the jackpot to a patron which the evidence clearly shows he did not win.

¶82. The majority concludes that because the some of the probable evidence no longer exists that the appropriate remedy is to award a jackpot to Hallmark. As the majority notes, this Court has previously held that if a party is found to have negligently destroyed or lost evidence then there is an inference that the lost evidence would have been unfavorable to that party. ***Thomas***, 781 So. 2d at 134. This is a complete

misapplication of the law regarding spoliation.

¶83. Today, the majority has, for all intents and purposes, successfully renovated the Supreme Court building into a state-sponsored casino; and therefore, I vehemently dissent.

**WALLER, COBB AND CARLSON, JJ., JOIN THIS OPINION.**