## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-SA-01476-SCT

*JAMES C. THOMAS*

*v.*

*ISLE OF CAPRI CASINO AND CDS SYSTEMS*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/1999 |
| TRIAL JUDGE: | HON. JERRY O. TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | HENRY BERNARD ZUBER, III |
| | KRISTIN L. DVORSKY |
| | SARA E. COOK |
| ATTORNEYS FOR APPELLEES: | KATHRYN H. HESTER |
| | KEITH R. RAULSTON |
| | CHARLIENE ROEMER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 02/15/2001 |
| MOTION FOR REHEARING FILED: | 3/1/2001; denied 4/12/2001 |
| MANDATE ISSUED: | 4/19/2001 |

### BEFORE PITTMAN, C.J., McRAE, P.J., AND WALLER, J.

### McRAE, PRESIDING JUSTICE, FOR THE COURT:

¶1. This appeal arises from a dispute between a casino patron, James Thomas ("Thomas"), the Isle of Capri Casino ("the Isle"), and Casino Data Systems ("CDS"), which owns the progressive slot machines and manages the systems that monitor the machines at the heart of this controversy. Thomas claims to have won two multi-million dollar progressive slot machine jackpots, while the Isle and CDS disagree.

¶2. The issue central to this appeal involves the spoliation of evidence caused by CDS's and the Isle's removal and dismantling of the slot machine while this controversy was pending, causing its memory to be erased. Furthermore, the circuit courts of Jackson and Harrison counties correctly denied Isle's and CDS's motion to dismiss for lack of jurisdiction. We reluctantly affirm the judgment of the Harrison County Circuit Court, as the Gaming Commission and the hearing examiner's decision was supported by the evidence.

### PROCEDURAL HISTORY

¶3. In the late night or early morning hours of October 14 and 15, 1995, James Thomas claims to have won two progressive jackpots on a single slot machine at the Isle of Capri Casino ("the Isle"). After the Isle and CDS refused to pay the jackpots, Thomas filed a complaint with the Mississippi Gaming Commission ("Commission"). An investigation was conducted by agent Debbie Fry on behalf of the Executive Director, who determined that no jackpot was won by Thomas.

¶4. Thomas appealed the Executive Director's decision, and a hearing was conducted before Hearing Examiner Larry Stroud over the course of three sessions in the fall of 1996. The Hearing Examiner found for the Isle and CDS and was affirmed upon later review by the Commission. Thomas appealed the Commission's order to the Circuit Court of Jackson County, and this appeal was subsequently transferred, rather than dismissed, to the Circuit Court of Harrison County, Second Judicial District, which affirmed the judgment of the Commission in its decision of July 30, 1999.

## FACTS

¶5. James Thomas is a resident of Chicago, Illinois, and had never been to a casino before arriving at the Isle of Capri Casino with several friends on October 14, 1995. Thomas was playing a Cool Millions progressive slot machine between 10:30 p.m. on October 14 and 1:00 a.m. on October 15 when he claims to have won two primary progressive jackpots. The Cool Millions machines are owned and monitored by Casino Data Systems, which is responsible for paying all jackpot awards.

¶6. According to Thomas, he began playing Cool Millions slot machine number 2947 at approximately 11:00 p.m., playing three coins at a time. After playing for a brief period, the machine locked up and began to make noises. Whistles were blowing, bells sounded, and to his left a light flashed white on top and blue on the bottom. At this time, Thomas testified, "three animals" were lined up across the pay line. According to Thomas, the three symbols that were lined up on the pay line looked like frogs, which matched the combination that was indicated on the top of the machine to be the winning combination for the highest jackpot. Thomas testified that, at this time, the jackpot was "two million point seven hundred and some odd thousand dollars."

¶7. Thomas was first approached by two unidentified female employees. Thomas testified that Lou Shampang, slot supervisor for the Isle, then walked up and said "So you got it?" "I said, 'Yes, I hit it.'" Shampang then opened the door of the machine while another man, said to be a slot technician, approached and entered the machine. Thomas says that the two men and the door of the machine blocked his view, preventing him from seeing what they were doing in the machine, but that when they were finished the reel combination that was on the screen was gone and the technician left quickly. Thomas testified that Shampang then put a coin in the machine and pulled the lever.

¶8. According to Thomas, he asked Shampang why he removed the jackpot combination, to which he replied "You didn't hit." "I said 'You done taken it off the reel. I hit it.'" Shampang then placed a card in the coin slot of the machine. "So I asked him, I said, 'Why is that?' He say, 'It's down.' I said, 'Down? What you mean it's down?' He wouldn't say anything. 'Call the Gaming Commission.'" "When I asked him who is the Gaming Commission, he said he didn't know. I say, 'You know their number?' He said 'No.' I said 'Well, how can I call them?' He just looked at me."

¶9. Shortly thereafter, Shampang removed the card from the coin slot, and Thomas resumed play on the same machine as before. At approximately 1:00 a.m., Thomas claims to have been playing three coins and hit a second jackpot on the same machine. He testified that machine locked up as before, that bells were ringing and lights flashing, and that three animals were lined up on the pay line. Thomas testified that he was not sure of the color combination of the animals, just that they looked like frogs, were the same as those that were lined up in the previous "jackpot winning," and that they matched the winning symbols indicated on the face of the machine as being the highest Cool Millions jackpot. At this time, Thomas said the progressive display showed the jackpot total to be "two million point seven hundred and some odd

thousand dollars."

¶10. At this time, Thomas testified that Shampang and slot shift supervisor Keith Vincent, approached. When he told them that he had "hit it" again, one of them put a key into the right side of the door, opening it. Vincent then went into the machine and "stayed there a while, wrote some numbers down, and he put his hand up in there." Thomas testified that his view was blocked by the door of the slot machine, but that when Shampang and Vincent were finished, the reels were changed so that a winning combination was no longer displayed. "I asked him why did he do that and he said, 'You didn't hit.' I said, 'Yes, I did.' He said, 'No, you didn't.' I said, 'Well, give me your card. I hit. I know I hit. Everything matches.'"

¶11. Before leaving the casino, Thomas was provided with the telephone number for the Gaming Commission, which he called, reaching a recording that said the Commission was closed until Monday. On the following Monday, October 16, 1995, Thomas spoke with Donnie Dobbs of the Gaming Commission, who told him to write a summary of the events and mail it to Richard Randall. Thomas did so on October 23, 1995. Thomas's letter to Dobbs included the names of potential witnesses, with addresses and telephone numbers.

¶12. At the hearing, Lawrence James and Elijah Brown testified that they accompanied Thomas to the casino and heard Thomas proclaim "I got it." According to James and Brown, three animals were lined up along the pay line that matched the jackpot symbols displayed on the front of the machine, and the machine was making noise and the lights were flashing. James testified that he later heard Thomas proclaim that he "got them again," and he that he again saw the same three animals on the pay line. Vera Brown testified that she heard that Thomas won and when she approached the machine, it was making noise and the white and blue lights were flashing. She testified that there were three animals on the pay line that matched the jackpot symbols.

¶13. According to Louis Shampang, slot supervisor for the Isle, the machine Thomas was playing at no time displayed a winning combination. He said that the machine was not locked up, but that Thomas was putting coins into the slot before the reels had stopped spinning, so that the coin did not register. Therefore, when he pulled the handle the reels would not spin. Shampang further testified that he opened the machine and cleared a coin jam from it. Thomas continued to play and complained that "the machine was not paying correctly." The next time Shampang saw Thomas was just before Thomas left the casino when he explained to Thomas "his only recourse was to contact the Gaming Commission."

¶14. After failing to satisfy Thomas in regard to the first purported jackpot, Shampang called his supervisor, Don Weaver, to whom Thomas indicated that he believed he had won the jackpot. Weaver testified that they were then joined by slot technician Leonard Masino. "We ran it through a few tests. The game appeared to be functioning as it should."

¶15. Masino initially testified that he ran a hopper test to ensure that the machine was paying properly, checked the Central Processing Unit (CPU) of the machine, ran a last game recall test, and a reel test, all of which indicated the machine was working properly. On cross-examination, Masino testified that he did not perform a CPU test on the machine Thomas was playing, as he did not have the key required to access the CPU of the Cool Millions machines.

¶16. Keith Vincent, assistant slot manager on the night in question, testified that he was called to machine 2947 after Thomas claimed to have won the second jackpot. Vincent testified that when he arrived,

Thomas told him that he had not been paid for his win, and that three red bars were showing on the pay line. Vincent performed a last game recall test and a hopper test, which required him to open the machine. Contrary to casino policy, he failed to note the entry on the machine's Machine Entry and Access Log (M.E.A.L) card.

¶17. On the night in question, Thomas was playing a Sigma slot machine, which has internal monitoring mechanisms, as well as the external monitoring systems run by CDS and the Isle. The machine itself has the ability to recall previous game outcomes. It can recall the number of jackpots won in the past, and the amount of time lapsed since the last jackpot. It is undisputed that, had the machine been available for such a test, it would have provided conclusive evidence whether Thomas actually won the jackpot when he claims he did. Once the CPU of a Sigma slot machine is removed, it can retain its memory for at least six months. The Isle or CDS employees never tested the CPU memory of machine 2947 for jackpots. The test to determine how much time has elapsed since the last jackpot takes just a few seconds and is described in the handbook provided by the manufacturer, Sigma Games.

¶18. In addition to internal monitors, the progressive slot machines are connected to two external tracking systems that monitor the machines and are run by both CDS and the Isle. Neither of these tracking systems recorded a jackpot on the night in question. The record shows that if these systems are plugged into the machine improperly, or if they are misaligned, or if the connections are loose, the tracking systems may fail to receive information from the slot machine. If this were to happen, it would be possible for the external tracking systems to fail to receive signals sent from the slot machine. In that event, the CPU of the machine would still contain that information, even though it was not transmitted to the external monitoring systems. Thomas's expert, Frank Shiels, testified that certain portions of the external tracking systems can fail to receive signals without causing the entire system to fail, and that "some of the meters can communicate while others do not."

¶19. To win a Cool Millions jackpot, a patron would have to play three coins, and red, white and blue ducks would have to line up on the pay line in that order. When this happens, the game is designed to lock up, both the white and blue tower lights will illuminate, and the machine will play a song. In addition, the progressive jackpot display sign should reset to $1 million. A Sigma slot machine can be played with fewer than three coins, though three coins must be played to win the multi-million dollar primary progressive jackpot.

¶20. On December 21, 1995, machine 2947 and one other slot machine were removed from the Isle, despite of the fact that the Isle was given notice on November 17, 1995, that Thomas was appealing the Gaming Commission's decision. The Isle claims that it decided to replace the two wall-mounted machines with two stand-alone machines because "they were generating less than one-tenth the play of other progressive machines in the same location." According to the Isle, these two machines were selected because their removal would not require the relocation of the Cool Millions sign above the machines. According to CDS, it did not receive notice of the dispute until March, 1996. After learning of the dispute, CDS did nothing to locate the memory components of the machine at issue.

¶21. After the removal of the machines from the Isle, the CPU of machine 2947 was put to use as a "backup board." These backups are kept to use as replacement parts in other machines owned by CDS. CDS Technical Supervisor Willie Orr testified that the replacement CPUs are co-mingled, and that the board from machine 2947 could have been installed in another casino, or it could still be in CDS's

possession, possibly locked in a service van. As previously stated, the CPU of a Sigma slot machine can retain its memory of all jackpot awards for more than six months after being removed from the machine. A simple test of the CPU would have rendered dispositive evidence in this dispute.

¶22. Orr testified that, once removed, the CPUs are not marked in any way to indicate in which machine they were originally placed. He estimated that CDS keeps approximately six to eight backup CPU boards. Once placed into another machine, the memory is erased and would not retain information from machine 2947. Before the memory components of the machine were "recycled," neither the Isle, nor CDS, nor the agent for the Gaming Commission ever tested machine 2947's memory to determine conclusively the elapsed time since a jackpot was won.

¶23. Thomas's initial contact with the Gaming Commission was with Donnie Dobbs, who took a telephone statement from Thomas on October 17, 1995. Dobbs filed a written report prepared from the notes of the conversation, which were since destroyed. Thomas and his eyewitnesses dispute the accuracy of the report.

¶24. Debbie Fry was a new and inexperienced agent at the time she was charged with handling the investigation into Thomas's claim on behalf of the Gaming Commission. In a letter to Thomas on October 30, 1995, she concluded that Thomas had not won a jackpot. She based her conclusion on the statements of Isle employees, on the report filed by Dobbs, on a videotape copy of casino surveillance, and on interviews with Louis Shampang and Keith Vincent. At no time did she speak with or otherwise interview Thomas or his eyewitnesses. She did not examine the machine and had no knowledge of the information contained in the machine's CPU.

¶25. In handling this dispute, the Isle failed to follow its own policy. When a patron is involved in a disputed claim and the slot supervisor has concluded that the casino should not pay it, the slot surveillance department should be notified. The surveillance department was not notified of Thomas's dispute and did not, therefore, focus the cameras on the machine Thomas was playing during this dispute. This omission was in violation of casino policy and resulted in the hearing examiner's reliance on a videotape of very poor quality.

¶26. More importantly, the Isle failed to follow the procedure required by the Mississippi Gaming Control Act for handling such disputes. The relevant portions of the applicable statute are as follows:

> (1) Whenever a licensee refuses payment of alleged winnings to a patron, the licensee and the patron are unable to resolve the dispute to the satisfaction of the patron and the dispute involves:
>
> (a) At least five hundred dollars ($500.00), the licensee shall immediately notify the executive director . . .
>
> (3) Failure to notify the executive director . . . as provided in subsection (1) is grounds for disciplinary action pursuant to Sections 75-76-103 through 75-76-119, inclusive.

Miss. Code Ann. § 75-76-159 (2000).

¶27. According to the Gaming Control Act, the casino, not the patron, is responsible for reporting such disputes to the Commission. The only action taken by the Isle to notify the executive director was just before Thomas left the casino, when Shampang advised Thomas to call the Gaming Commission. This type of action should not be tolerated by the Commission.

## STANDARD OF REVIEW

¶28. The standard of review for this casino patron dispute is governed by the Mississippi Gaming Control Act, Miss. Code Ann. § 75-76-171 (3)(d) (2000), which states that an order of the Gaming Commission may be reversed "if the substantial rights of the petitioner have been prejudiced because the decision is . . . unsupported by any evidence." In *Mississippi Gaming Comm'n v. Freeman*, 747 So.2d 231, 239 (Miss. 1999), this Court held that the "any evidence" standard applies to patron disputes under the Act, and overturned the circuit court's application of the substantial evidence standard. The "any evidence" standard was again applied to a patron dispute by this Court in *IGT v. Kelly*, No. 1998-CC-01783-SCT 2000 WL 424531, at * 2 (Miss. Apr. 20, 2000).

## DISCUSSION

**I. Whether the Harrison County Circuit Court was within its jurisdiction in hearing Thomas's appeal of the Gaming Commission's decision.**

¶29. Thomas filed his appeal in the Jackson County Circuit Court, which denied the Isle and CDS's motion to dismiss for lack of jurisdiction and transferred the case to the Circuit Court of Harrison County. Isle and CDS contend that Thomas filed his complaint in the wrong circuit court, that the Jackson County Circuit Court should have dismissed his cause for lack of jurisdiction rather than transferring it to the Harrison County Circuit Court, and that Thomas's appeal should be dismissed because it was not timely perfected.

¶30. The Isle and CDS argue that the legislature only vested jurisdiction to review Gaming Commission decisions of patron disputes in the circuit court of the county in which the dispute arose. To support this contention, the Isle and CDS cite Miss. Code Ann. § 75-76-167(1) (2000), which states the following:

> Any person aggrieved by a final decision or order of the commission made after hearing by the commission pursuant to sections 75-76-159 through 75-76-165, inclusive, may obtain a judicial review thereof **in the circuit court of the county in which the dispute between the licensee and patron arose**.

(emphasis added).

¶31. This section governs the patron dispute at bar. Section 75-76-167 is placed among other sections which deal with patron disputes.

¶32. However, the Mississippi Constitution specifically provides that a suit improperly filed "in the circuit court" will be transferred to the appropriate chancery court, which will treat the case as if it was properly filed. Miss. Const. art. 6, § 157. A complimentary provision of the constitution requires that causes filed in the chancery court, over which the circuit court has exclusive jurisdiction, shall be transferred to the circuit court. *Id*. art. 6, § 162.

¶33. The constitution further provides that no civil judgment will be reversed solely for lack of jurisdiction when a non-equity case is erroneously filed in the chancery court, or vice versa. *Id*. art. 6, § 147. In interpreting section 147, this Court has held that:

> [T]he court is not to be constrained by the literal meaning of words used and as then used . . . and particularly is this true in respect to provisions intended to prevent or remedy definite evils, otherwise

the same evils, in whole or in part, under new names or different guises, could find another foothold within the same structure that was designed to keep them out."

*Moore v. General Motors Acceptance Corp.*, 155 Miss. 818, 125 So. 411, 412 (1930). This Court went on to hold that section 147 also applies to actions filed in <u>county</u> court, even though the terms of the provision specifically state that it applies to "chancery or circuit" courts. In doing so, we refused to be confined to the terms "chancery" court and "circuit" court, so that litigation leading to a decree that is correct on the merits should not be reversed solely on the basis that the case was filed in a court without jurisdiction. *Id*. at 413.

¶34. In the case at bar, the Jackson County Circuit Court refused to dismiss Thomas's claim by analogizing the appeal of Gaming Commission decisions to the judicial review statute of the Mississippi Workers' Compensation Act. That section, Miss. Code Ann. § 71-3-51 (2000), states that appeals of Commission decisions should be taken in "the circuit court of the county in which the injury occurred." The circuit court correctly observed that this statute should relate to venue, rather than jurisdiction, and rejected an argument similar to that rejected in *Leake County Coop. (A.A.L.) v. Barrett's Dependents*, 226 So.2d 608 (Miss. 1969).

¶35. As the foregoing authority makes clear, jurisdictional and venue statutes are to be construed in the interest of justice, so that a legitimate claim, resolved correctly on the merits, will not be forfeited by filing in the wrong court. Regardless of whether Miss. Code Ann. § 75-76-167 (2000) confers jurisdiction or connotes venue, the proper course of action when a Gaming Commission decision is appealed to the wrong court is to transfer the action to the proper court. Otherwise, a claim could be inadvertently filed in the wrong court, subsequently dismissed, and then time-barred in the proper court. This is what the Isle and CDS ask this Court to do. We decline this invitation.

### II. Whether the hearing examiner applied the proper legal standard for spoliation of evidence.

¶36. The information contained in the CPU of slot machine 2947 would have conclusively established whether Thomas had in fact won any jackpots on the night in question, and how much time had elapsed since it occurred. Before the memory components of the machine were "recycled," neither the Isle, nor CDS, nor the agent for the Gaming Commission ever tested the machine's memory to determine conclusively the elapsed time since a jackpot was won. The actions of the Isle and CDS in removing and "recycling" machine 2947 have caused the permanent and irretrievable loss of this information.

¶37. When evidence is lost or destroyed by one party (the "spoliator"), thus hindering the other party's ability to prove his case, a presumption is raised that the missing evidence would have been unfavorable to the party responsible for its loss. According to Wigmore:

> [S]poliation and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates indefinitely though strongly against the whole mass of alleged facts constituting his cause.

2 J. Wigmore, *Evidence* § 278, at 133 (J. Chadbourn rev. 1979). Because the presumption of

unfavorability is not solely confined to the specific issue of what information was contained in the missing evidence, the fact finder is free to draw a general negative inference from the act of spoliation, regardless of what the spoliator's rebuttal evidence shows.

¶38. The Isle and CDS argue that the negative presumption raised by spoliation "may only be drawn when the destruction is unexplained or deliberate." However, the information contained in machine 2947 was not lost by act of God or in a fire, but was destroyed by the actions of Isle and CDS when at least one of them was aware of the pending dispute.

¶39. If not intentional, their actions were at least grossly negligent. The casino was under a statutory duty to contact the Commission when it became clear that the dispute had not been resolved to Thomas's satisfaction. Had the Isle done so, a more thorough investigation may have ensued, and the slot machine would have been preserved. Therefore, it cannot be said that the information contained in the CPU of machine 2947 was lost through no fault of the Isle or CDS.

¶40. Requiring an innocent litigant to prove fraudulent intent on the part of the spoliator would result in placing too onerous a burden on the aggrieved party. To hold otherwise would encourage parties with weak cases to "inadvertently" lose particularly damning evidence and then manufacture "innocent" explanations for the loss. In this way, the spoliator could essentially destroy evidence and then require the innocent party to prove fraudulent intent before the destruction of the evidence could be used against it.

¶41. Other jurisdictions have held that both intentional and negligent loss of evidence can constitute spoliation. *See, e.g.*, ***Public Health Trust v. Valcin,*** 507 So.2d 596, 599 (Fla. 1997). In ***Valcin***, the Florida Supreme Court held that the negligent failure to maintain medical records pursuant to statutory duty gives rise to the negative inference that the records would be unfavorable to the spoliator. *Id*. "The presumption remains in effect even after the party to whom it has been shifted introduces evidence tending to disprove the presumed fact." *Id*. at 600. Whether the negative inference has been overcome then becomes a question of fact. *Id*. *See also* ***Welsh v. United States***, 844 F.2d 1239, 1246-47 (6th Cir. 1988) (holding that the negligent loss or alteration of medical records gives rise to negative inference); ***Sweet v. Sisters of Providence in Washington***, 895 P.2d 484, 492 (Alaska 1995) (holding that negative presumption is raised absent a finding of fact that the loss of a medical record is excused).

¶42. This Court adopted a similar rule in ***DeLaughter v. Lawrence County Hosp.***, 601 So.2d 818, 822 (Miss. 1992). In ***DeLaughter***, we held that "where a (medical) record required by law to be kept is <u>unavailable due to negligence</u>, an inference arises that the record contained information unfavorable to the hospital, and the jury should be so instructed." *Id*. (emphasis added).

¶43. The failure of the Casino to follow the dictates of the Gaming Control Act, and the Isle's and CDS's failure to preserve the slot machine therefore resulted in a presumption that the evidence contained in the CPU of machine 2947 was unfavorable to the those responsible for its destruction. In spite of this presumption, the hearing examiner, however, had ample secondary evidence on which to base his findings.

¶44. At the hearing, the records of both the CDS independent slot tracking system and the Isle independent slot tracking system were admitted in evidence. The examiner concluded that both were functioning properly at the relevant times and indicate that no jackpot was won. He also had experts to describe the function of the machine in jackpot mode and a surveillance tape, though of admittedly poor quality, for comparison. Though the numerous witnesses offered conflicting testimony, the hearing examiner, as the

finder of fact, was responsible for judging their veracity. The decision was therefore based on evidence and does not meet the "unsupported by any evidence" standard to require a reversal.

## CONCLUSION

¶45. For the foregoing reasons, the Harrison County Circuit Court had jurisdiction to hear Thomas's appeal, and the Jackson County Circuit Court was correct in transferring this case to the Harrison County Circuit Court, which was the proper venue under Miss. Code Ann.§ 75-76-167(1) (2000). The negligent destruction of the slot machine, the most probative evidence in this case, by the Isle and CDS raises a negative presumption against the spoliators. However, the hearing examiner found that the presumption had been rebutted by other evidence. As his decision was based on evidence properly admitted, we cannot say that his decision was not based on "any evidence." Therefore, the judgment of the Harrison County Circuit Court is affirmed.

¶46. **AFFIRMED.**

**BANKS, P.J., MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. PITTMAN, C.J., AND SMITH, J., CONCUR IN RESULT ONLY.**