# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-00876-SCT

*FRANCES MARY (ROBBINS) RICHARDSON, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF MICHAEL RAY ROBBINS, II, DECEASED*

*v.*

*NORFOLK SOUTHERN RAILWAY COMPANY*

DATE OF JUDGMENT:             03/26/2004
TRIAL JUDGE:                  HON. THOMAS J. GARDNER, III
COURT FROM WHICH APPEALED:    ALCORN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      JOHN W. CHANDLER, JR.
                              PAMELA R. O'DWYER
                              PHIL R. HINTON
ATTORNEYS FOR APPELLEE:       STEPHANIE CAMILLE REIFERS
                              EVERETT B. GIBSON
NATURE OF THE CASE:           CIVIL - PERSONAL INJURY
DISPOSITION:                  AFFIRMED - 01/19/2006
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WALLER, P.J., EASLEY AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     This wrongful death case arises from an accident in which a train collided with a car crossing the railroad tracks at a grade crossing. The driver of the car, Michael Ray Robbins, died as a result of his injuries from the accident. His mother, Frances Mary (Robbins) Richardson, sued both Alcorn County, the county in which the incident occurred, and

Norfolk Southern Railway Company for negligence. Alcorn County prevailed on its motion for summary judgment, leaving Norfolk Southern the remaining defendant.[1] At trial, the jury returned a verdict for Norfolk Southern, and the trial court entered judgment consistent with the jury verdict. Richardson now appeals to us, asserting error in the trial court's entry of its final judgment in favor of Norfolk Southern. Finding no reversible error, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. On May 10, 1999, sixteen year old Michael Ray (Mikie) Robbins was driving over a railroad grade crossing on County Road 715 in Alcorn County when a Norfolk Southern Railway Company train struck his car. Mikie died as a result of the injuries sustained in the collision. The grade crossing was equipped with passive warning devices, such as advance warning signs and pavement markings, but not active warning devices, such as flashing signal lights and automatic gates. Additionally, there was limited visibility to drivers at the grade crossing because of an embankment, grass, trees, and debris which obstructed the view on the right of way. Richardson, Mikie's mother and administratrix of his estate, brought suit against Norfolk Southern, and later amended the complaint to add Alcorn County as a defendant. In her amended complaint, Richardson alleged that Alcorn County negligently maintained the crossing by failing to provide adequate active warning devices; failing to properly maintain the passive warning devices; and failing to remedy the overgrown conditions which limited visibility at the grade crossing. The basis of the complaint against

---

[1]Richardson does not appeal from the trial court's grant of summary judgment as to Alcorn County.

2

Norfolk Southern was also negligent maintenance for the inadequate signal and the overgrown conditions; Richardson also asserted that Norfolk Southern was negligent in failing to sound the horn and to properly operate the train due to the train's excessive speed at a grade crossing known to be dangerous.

¶3.     Because the passive devices had been installed with federal funds, Alcorn County prevailed on its motion for summary judgment on the ground that federal regulations preempted state tort law. The trial court found Richardson's claim that the signalization was inadequate was preempted by the Federal Railroad Safety Act, and that Alcorn County had no duty to maintain the obstructed right-of-way as it was privately owned.

¶4.     After the trial court granted Alcorn County's motion for summary judgment, Richardson filed a second amended complaint against Norfolk Southern. Norfolk Southern filed a motion for partial summary judgment, alleging, inter alia, the same grounds as Alcorn County – that federal law preempted state tort law. The trial court granted partial summary judgment on the issue of adequate signalization, finding the issue of the adequacy of crossing warning devices was deemed to be preempted by federal law; however, the trial court found its ruling on this issue would not preclude Richardson "from contending at trial that [Norfolk Southern] negligently failed to properly maintain the passive warning devices at that location in good condition and failed to properly maintain the right-of-way belonging to the railroad at the scene." The trial court additionally found the excessive speed claim was preempted by federal law. By denying, in part, Norfolk Southern's motion for partial summary judgment,

3

the trial court permitted Richardson to proceed to trial on her claims that Norfolk Southern (1) failed to properly maintain the passive warning devices at the scene in good condition; and, (2) failed to properly maintain the railroad right-of-way at the scene.

¶5. In response to Richardson's efforts to introduce certain evidence at trial, Norfolk Southern filed a pre-trial motion in limine to exclude evidence of two other accidents involving Matthew Bradley and Wendy McClure. The trial court granted this motion, thus excluding evidence of these other accidents.

¶6. At trial, Richardson submitted proposed jury instructions P-12 and P-22, regarding the duties of a motorist at a grade crossing; however, the trial court refused them and instead gave jury instructions C-20 and C-21. Because Norfolk Southern employees never properly recovered the event recorder data, Richardson also submitted jury instruction P-16, regarding spoliation of evidence, but the trial court refused to give that instruction. On appeal, Richardson claims that the trial court erred in (1) granting partial summary judgment on the federal preemption issue; (2) excluding evidence of prior accidents at the same railroad crossing; and, (3) refusing three jury instructions which she submitted.

## DISCUSSION

### I. FEDERAL PREEMPTION OF STATE LAW

¶7. Richardson pursued this action against Norfolk Southern on tort theories of liability. Norfolk Southern's defense included an assertion that federal law preempted Richardson's claim.

4

¶8. We review de novo a grant of summary judgment under Miss. R. Civ. P. 56. *Leffler v. Sharp*, 891 So.2d 152, 156 (Miss. 2004). A motion for summary judgment should be granted only when no genuine issue of material fact exists, and the moving party is entitled to a judgment as a matter of law. Miss. R. Civ. P. 56(c). The movant has the burden of showing that no genuine issue of material fact exists, giving the non-movant the benefit of the doubt as to the existence of any genuine issues of material facts. *McCullough v. Cook*, 679 So.2d 627, 630 (Miss. 1996). However, in *Richmond v. Benchmark Constr. Corp.*, 692 So.2d 60, 62 (Miss. 1997), this Court also said: "[t]he party opposing the motion must be diligent." Mere reliance on the allegations or denials in the pleadings is not sufficient; but instead, the party opposing the motion is required to set forth specific facts showing that genuine issues for trial do exist. *Id.*

¶9. This Court must also view the evidence in the light most favorable to the party against whom the motion has been made. *Leffler*, 891 So.2d at 156. A motion for summary judgment is not a substitute for a trial of disputed fact issues. *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331, 335 (Miss. 2004). On a Rule 56 motion, this Court must only determine if there are issues to be tried; we need not actually try those issues. *Id.* The mere presence of fact issues in the record does not entitle a party to avoid summary judgment per se. *Id.* "'The court must be convinced that the factual issue is a material one, one that matters in an outcome determinative sense . . . the existence of a hundred contested issues of fact will not thwart summary judgment where there is no genuine dispute regarding

5

the material issues of fact.'" ***Leffler***, 891 So.2d at 156 (quoting ***Simmons v. Thompson Mach*. *of Miss., Inc.,*** 631 So.2d 798, 801 (Miss. 1994) (citing ***Shaw v. Burchfield***, 481 So.2d 247, 252 (Miss. 1985)); *see also*, ***Brown v. Credit Center, Inc.***, 444 So.2d 358 (Miss. 1983). Finally, issues of law are subject to de novo review by this Court. ***Andrus v. Ellis***, 887 So.2d 175, 179 (Miss. 2004).

¶10.    The Code of Federal Regulations requires "adequate warning devices" be installed on any railroad-highway grade crossing that is part of a federal-aid highway project before the crossing is opened. 23 C.F.R. § 646.214(b)(2) (2005). Where federal-aid funds were used for installation of the warning devices, "adequate warning devices" include active signal devices, or "automatic gates with flashing light signals," but only when one of six conditions exists. 23 C.F.R. § 646.214(b)(3). When those six conditions do not exist, the Federal Highway Administration must approve the warning device. 23 C.F.R. § 646.214(b)(4).

¶11.    Recognizing that federal law preempts a state law when the two are in conflict, the United States Supreme Court found in ***CSX Transportation, Inc. v. Easterwood***, 507 U.S. 658, 670, 113 S.Ct. 1732, 1740-41, 123 L.Ed.2d 387 (1993), that when 23 C.F.R. §§ 646.214(b)(3) and (4) are applicable, these federal regulations preempt state tort law. In that wrongful death case, which also arose out of a train-automobile collision, the Court found the regulations did not apply because the party raising the defense failed to establish their applicability. The ***Easterwood*** Court held the federal regulation must "cover" the same subject matter and not merely touch upon it or relate to it. ***Id*** at 664.

6

¶12. The United States Supreme Court later, in a case with facts similar to *Easterwood* and this case, held the Federal Railway Safety Act (FRSA), in conjunction with §§ 646.214(b)(3) and (4), preempts state tort law actions against a railway company for failing to maintain adequate warning devices at crossings where federal funds were used for installation of the warning devices. *Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344, 347, 120 S.Ct. 1467, 1471, 146 L.Ed.2d 374 (2000). The Court also held that, "Sections 646.214(b)(3) and (4) 'cover the subject matter' of the adequacy of warning devices installed with the participation of federal funds." *Id.* at 358. The Court likewise found the FRSA preempted the state tort claim that the advance warning signs and reflectorized crossbucks installed at the grade crossing in that case were inadequate. *Id.*

> Because the [Tennessee Department of Transportation] used federal funds for the signs' installation, §§ 646.214(b)(3) and (4) governed the selection and installation of the devices. And because the TDOT determined that warning devices other than automatic gates and flashing lights were appropriate, its decision was subject to the approval of the [Federal Highway Administration]. See § 646.214(b)(4). Once the FHWA approved the project and the signs were installed using federal funds, the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject, thereby pre-empting respondent's claim.

*Id.* at 358-359.

¶13. Richardson argues that a prior decision of this Court dispels Norfolk Southern's defense. In *Kansas City Southern Ry. Co., Inc. v. Johnson*, 798 So.2d 374, 379 (Miss. 2001), we stated: "[b]efore federal law will preempt a state law there must be proof that federal-aid funds were used in the installation of devices including automatic gates with

7

flashing light signals when one or more of several conditions exist." That much is true - proof is required. However, Richardson asserts the rule in *Johnson* is that two factual elements are needed for federal preemption – federal approval and federal funding. A close reading of *Johnson* reveals it does not stand for this proposition. In *Johnson,* this Court found no federal preemption because of the lack of proof after a "careful examination of the record." *Id.* at 379. In *Johnson*, we reiterated that "there must be more than the existence of a plan in that the plan must also have been implemented." *Id.* (citing *Pearson v. Columbus & Greenville Railway Co.*, 737 So.2d 390, 396 (Miss. Ct. App. 1998)). In today's case, Norfolk Southern relied on documents with a federal aid approval number and affidavits of former Mississippi Department of Transportation Employee Stephen Edwards, to prove federal funds were used for installation of the warning devices. Richardson called into question the authenticity of the document with the federal-aid funding number on it, alleging Norfolk Southern had altered it, changing a 5 to a 6, but she never explained why that would mean the document was no longer proof of federal-aid funding.

¶14.    Finally, Richardson claims that where there is no remedy, there is a presumption against federal preemption, relying on *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984). *Silkwood* dealt with the preemption of punitive damages and, more specifically, addressed congressional intent when there is a lack of a *federal* remedy, not merely the lack of any remedy. The U.S. Supreme Court in *Easterwood* found federal preemption would not lie unless it was the clear and manifest purpose of

8

Congress to do so, but also noted in its statutory construction analysis that the plain wording of the regulation is the starting point to find the congressional intent behind the rule. *Eastwood*, 507 U.S. at 664. In *Easterwood*, the Supreme Court stated:

> In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Evidence of pre- emptive purpose is sought in the text and structure of the statute at issue. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983). If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.

*Id.* at 663-64. Looking to the text of 23 C.F.R. §§ 646.214(b)(3) & (4), the *Easterwood* Court found those provisions preempted state tort law when they were applicable. *Id.* at 669.

¶15. For these reasons, we are firmly convinced the trial court correctly applied federal preemption law to Richardson's claims of inadequate signalization. We thus find this issue to be without merit.

## II. ADMISSIBILITY OF PRIOR ACCIDENTS

¶16. Richardson asserts the trial court erred in excluding evidence at trial of two other accidents at this same grade crossing. The standard of review for the admission or suppression of evidence in Mississippi is abuse of discretion. *Miss. Transp. Comm'n v. McLemore*, 863 So.2d 31, 34 (Miss. 2003). Using an abuse of discretion standard, the trial judge's decision will stand unless we find the judge's exercise of such discretion was

9

arbitrary and clearly erroneous. *Id.* A trial judge's findings of fact must be manifestly wrong and against the overwhelming weight of the evidence for an appellate court to disturb them. ***Miss. Dept. of Transp. v. Cargile***, 847 So.2d 258, 263 (Miss. 2003). The rule has been long established in Mississippi that evidence of prior accidents may be introduced at trial to show two things: (1) the existence of a dangerous condition; and, (2) the defendant's notice or knowledge of such dangerous condition. ***Yoste v. Wal-Mart Stores, Inc.***, 822 So.2d 935, 936 (Miss. 2002); *see also* Miss. R. Evid. 404(b). However, evidence of prior accidents will only be admitted upon a showing of substantial similarity of conditions. ***Yoste***, 822 So.2d at 936. This Court has made it clear that when evidence of other accidents is introduced, it may not be too remote in time from the accident in issue. ***Illinois Cent. R.R. v. Williams***, 135 So.2d 831, 839 (Miss. 1961). We found in ***Williams*** that "other accident" evidence occurring within nine months of the subject of the dispute was not too remote in time for the evidence to be inadmissible. *Id.* This Court has also found "other accident" evidence occurring over time periods less than one year close enough in time to be admissible. ***Barrett v. Parker***, 757 So.2d 182, 188-89 (Miss. 2000) (one year); ***S.H. Kress & Co. v. Markline***, 77 So.2d 858, 864 (Miss. 1918) (two years).

¶17. Turning to this case, Richardson attempted to introduce evidence of a prior accident which occurred at this same grade crossing on December 12, 1985. This prior accident involving Matthew Bradley occurred over thirteen years prior to Mikie's accident on May 10, 1999. The other accident, involving Wendy McClure, occurred in January, 2003, over

10

three and one-half years after Mikie's accident. Richardson argues that because both McClure and Bradley were traveling west across the same grade crossing when a Norfolk Southern train traveling north collided with their cars, the accidents are substantially similar and thus admissible. We do not agree. This Court has never found a period of time such as over thirteen-years close enough in time to be admissible. One accident occurring at the same location over thirteen years before Mikie's accident does not necessarily show an existence of a dangerous condition or that the defendant had notice or knowledge of a dangerous condition. Also, conditions at the scene obviously change over such a long period of time. Likewise, an accident occurring at the same location more than three and one-half years after Mikie's accident could not possibly be relevant to prove that a yet-to-happen 2003 accident put Norfolk Southern on notice in 1999 that a dangerous condition existed at the grade crossing at the time of Mikie's accident.

¶18. For these reasons, we find the trial court did not abuse its discretion in excluding this "other accident" evidence. In excluding this evidence, the trial court's action was neither arbitrary, nor clearly erroneous, nor was it manifestly wrong and against the overwhelming weight of the evidence. This issue is thus without merit.

### III. REFUSED JURY INSTRUCTIONS

¶19. When we review a claim of trial court error in granting or denying jury instructions, we are required to read and consider all of the jury instructions together as a whole. ***Burr v. Mississippi Baptist Medical Center***, 909 So.2d 721, 726 (Miss. 2005). No instruction

11

should be taken out of context or read alone in isolation. *Id.* "[T]he trial judge may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case." *Id.* When reading the instructions as a whole, this Court must determine whether the jury was properly instructed. *Burton ex rel. Bradford v. Barnett*, 615 So.2d 580, 583 (Miss. 1993). This proposition stands even if one specific instruction may be arguably faulty. "Defects in specific instructions do not require reversal 'where all instructions taken as a whole fairly-although not perfectly - announce the applicable primary rules of law.'" *Id.* (citations omitted). On the other hand, we are required to find reversible error if the instructions in any given case, when considered together as a whole, do not fairly and adequately instruct the jury.

### A. INSTRUCTIONS P-12 AND P-22

¶20. Richardson submitted two proposed jury instructions, numbers P-12 and P-22, to be considered by the trial court.

¶21. Instruction P-12 stated:

> This Court instructs you that whenever any person driving a vehicle approaches a railroad grade crossing when an approaching railroad train is plainly visible and in hazardous proximity to such crossing the driver of such vehicle has a duty to stop not less than 15 feet from the nearest rail of such railroad, and not to proceed until he can do so safely.

> If you find that Mikie Robbins was also negligent and that his negligence was a contributing proximate cause of the May 10, 1999 collision at the County Road 715 railroad crossing then you shall reduce the amount of the verdict for the Plaintiff according to the Mississippi law of comparative negligence.

12

¶22.    Instruction P-22 stated:

In the trial of all actions to recover personal injury or property damages, sustained by any driver of such vehicles for collision of said vehicle and train in which action it may appear that the said driver may have violated any of the provisions hereof, the question of whether or not the said violation was the sole or proximate cause of the accident and injury shall be for the jury to decide. The violation of this section shall not of itself defeat recovery and the question of negligence or the violation aforesaid shall be left to the jury; and the comparative negligence statutes and prima facie statute of this state shall apply in these cases as in other cases of negligence.

¶23.    Although the trial court refused these two instructions, the trial court did give instructions C-20 and C-21.   Instruction C-20 stated:

The law requires that when any person driving a vehicle approaches a railroad grade crossing, he shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely, under the following circumstances:

(1) When there is railroad train (sic) approaching within approximately nine hundred (900) feet of the highway crossing emits a signal in accordance with the law, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;

(2) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

¶24.    Instruction C-21 stated:

The law requires that at any railroad grade crossing provided with visible railroad crossbuck signs, the driver of a vehicle shall, in obedience to such railroad crossbuck sign, yield the right-of-way and slow to a speed reasonable for the existing conditions, and shall stop if required for safety at a clearly marked stop line, or if no stop line, within fifty (50) feet, but not less than fifteen (15) feet, from the nearest rail of the railroad, and shall not proceed until he can do so safely.

13

¶25. While Richardson's proposed instruction P-12 mirrored Miss. Code Ann. § 77-9-249(1)(d), it was an incomplete statement of the law, confusing, and misleading. In applying this instruction, the jury would have been required to find that Mikie had a statutory duty to stop at the crossing only if the train was plainly visible and in hazardous proximity to the crossing. Conversely, according to instruction P-12, if the jury found the train was not plainly visible, Mikie was not under a statutory duty to stop at the crossing. This is an incorrect and incomplete statement of the law. Miss. Code Ann. Section 77-9-249(1) (Rev. 2001) states:

> (1) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
>
> > (a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
> >
> > (b) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
> >
> > (c) A railroad train approaching within approximately nine hundred (900) feet of the highway crossing emits a signal in accordance with Section 77-9-225, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
> >
> > (d) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.[2]

---

[2]This statute has since been amended, inter alia, by adding "or" after the semicolon at the end of subsections (a), (b), and (c).

¶26. In ***Alabama Great Southern R. Co. v. Lee,*** 826 So.2d 1232 (Miss. 2002), we addressed the statute as it existed at the time of Mikie's accident and stated that Section 77-9-249 imposed upon a driver approaching a grade crossing the duty to stop "when one of the enumerated conditions is met." ***Id.*** at 1237 (citing ***Mitcham v. Illinois Cent. Gulf R. R.***, 515 So.2d 852, 854 (Miss. 1987)). Therefore, the trial court correctly refused instruction P-12 and correctly gave the court's instruction C-20, which informed the jury that a driver, such as Mikie, had a statutory duty to stop, not only if a train was plainly visible and was in hazardous proximity to the crossing, but also, if a train was approaching within approximately nine-hundred feet of the crossing while emitting a signal pursuant to statute and that the train, due to its speed or close proximity to the crossing, was an immediate hazard.

¶27. The trial court was equally correct in giving instruction C-21 which merely informed the jury that a driver, such as Mikie, was required to slow to a reasonable speed in approaching a grade crossing with railroad crossbuck signs, and to stop, if necessary for safety purposes, and to then proceed only upon being able to do so safely. The record supported the giving of this instruction, which was a correct statement of the law. *See* Miss. Code Ann. § 77-9-249(4).

¶28. Richardson also submitted instruction P-22, which was basically a verbatim recitation of Miss. Code Ann. Section 77-9-249(3). This statute states:

> (3) In the trial of all actions to recover personal injury or property damages, sustained by any driver of such vehicles for collision of said vehicle and train

in which action it may appear that the said driver may have violated any of the provisions hereof, the question of whether or not the said violation was the sole or approximate cause of the accident and injury shall be for the jury to determine. The violation of this section shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury; and the comparative negligence statutes and prima facie statute of this state shall apply in these cases as in other cases of negligence.

Miss. Code Ann. § 77-9-249(3) (Rev. 2001).

In refusing this instruction, the trial court quite appropriately found, inter alia, that this instruction included "a section out of the Mississippi Code which I consider to be a directive to the court in the trial of the case and not the subject of an instruction to the jury." This statute provides, inter alia, that even if a driver of a vehicle which collides with a train violates any of the statutory duties enumerated in Section 77-9-249, such statutory violations will not, in and of themselves, bar recovery, but instead the jury may still determine the negligence issues by utilizing our familiar comparative negligence statutes. The trial judge ensured the jury would have this opportunity when he gave and read to the jury instruction number C-23, which stated:

> This Court instructs the jury that, if you find from a preponderance of the evidence, that Mikie Robbins and Norfolk Southern Railway Company were both negligent, and that the negligence of both parties was a proximate contributing cause of the May 10, 1999 collision, you must return a verdict for the plaintiff. However, you must reduce any award that you would otherwise make for the Plaintiff by the percentage of negligence that you attribute to Mikie Robbins.

¶29. In sum, when we consider all of these instructions as a whole, the jury was properly and adequately instructed on all relevant points of law. Thus, this issue is without merit.

16

**B. INSTRUCTION P-16**

¶30.   The event recorder on the lead locomotive unit of the train involved in this accident was never recovered. Federal law requires any train operating faster than 30 miles per hour to have an in-service event recorder. 49 CFR § 229.135 (2005). The regulation requires the railroad to preserve the data on the event recorder and provide it to the Federal Railroad Administration or the National Transportation Safety Board if an accident occurs. The regulation also provides rules for how the train should respond to a defective recorder and how the recorder may be removed from service. *Id.* Civil penalties exist for anyone who willfully removes or tampers with an event recorder. *Id.*[3] Richardson believed this event recorder would contain valuable evidence concerning whether the engineer properly sounded the horn for the required statutory distance. Thus, Richardson submitted a proposed spoliation of evidence jury instruction. The trial court refused Richardson's proposed jury instruction number P-16, which stated:

> The Court instructs the jury that, if you find from a preponderance of the evidence that:
>
> 1. Employees of Norfolk Souther Railway Company intentionally removed the event recorder or "black box" from the lead locomotive after the May 10, 1999 collision; or
> 2. Norfolk Southern Railway Company negligently failed to secure the data on that black box causing it to be destroyed, misplaced, last (sic), or otherwise unavailable for use at this trial; you should presume that said black box contained evidence that was unfavorable to Norfolk Souther Railway Company.

---

[3]There is no evidence in the record that the non-party, Union Pacific, much less, Norfolk Southern, willfully removed or tampered with the event recorder.

As authority for this instruction, Richardson relied on ***Thomas v. Isle of Capri Casino***, 781 So.2d 125 (Miss. 2001), and ***DeLaughter v. Lawrence Co. Hospital***, 601 So.2d 818 (Miss. 1992). These cases indeed state that when evidence is lost or destroyed by a party, thus hindering another party's ability to prove his or her case, a presumption is raised that this missing information would have been unfavorable to the party responsible for the loss or destruction of such evidence. ***Thomas***, 781 So.2d at 133-34; ***DeLaughter***, 601 So.2d at 821-23.

¶31. However, a careful review of ***Thomas*** and ***DeLaughter*** reveals that these cases are clearly factually distinguishable from our case today. In ***Thomas***, a casino patron claimed to have hit the "Cool Millions" jackpot on slot machine number 2947, not once, but twice, during the course of gambling which continued from late evening into the early morning hours of the next day. According to the patron, on each occasion, bells were ringing, whistles were blowing, and lights were flashing; and, likewise, on each occasion, casino employees approached the slot machine and cleared the machine, claiming that the patron had not hit the jackpot. During the time that the casino patron was appealing to circuit court the Gaming Commission's denial of his claim, the casino removed slot machine number 2947 from the floor, replaced the Central Processing Unit (CPU) from machine number 2947, and placed the CPU into another machine as a "backup board," thus destroying any information which could have been dispositive as to the issue of whether the patron had indeed hit the jackpot. In addressing this issue, we stated, inter alia:

18

The Isle and CDS [Casino Data Systems] argue that the negative presumption raised by spoliation "may only be drawn when the destruction is unexplained or deliberate." However, the information contained in machine 2947 was not lost by act of God or in a fire, but was destroyed by the actions of Isle and CDS when at least one of them was aware of the pending dispute.

If not intentional, their actions were at least grossly negligent. The casino was under a statutory duty to contact the Commission when it became clear that the dispute had not been resolved to Thomas's satisfaction. Had the Isle done so, a more thorough investigation may have ensued, and the slot machine would have been preserved. Therefore, it cannot be said that the information contained in the CPU of machine 2947 was lost through no fault of the Isle or CDS.

Requiring an innocent litigant to prove fraudulent intent on the part of the spoliator would result in placing too onerous a burden on the aggrieved party. To hold otherwise would encourage parties with weak cases to "inadvertently" lose particularly damning evidence and then manufacture "innocent" explanations for the loss. In this way, the spoliator could essentially destroy evidence and then require the innocent party to prove fraudulent intent before the destruction of the evidence could be used against it.

*Thomas*, 781 So.2d at 133.

¶32.    In *DeLaughter,* a daughter commenced a wrongful death suit against certain doctors and a hospital for her mother's death. Critical hospital records were lost and at trial, the plaintiff submitted three spoliation of evidence instructions, all of which were refused by the trial court. This Court addressed this issue by stating, inter alia:

The evidence in this case shows that the Hospital refused to release Ms. Lambert's medical records to her family without proper authorization. On March 5, 1985, after the death of Ms. Lambert, the Director of Nurses at Lawrence County Hospital instructed the records custodian to lock up Ms. Lambert's record so that the family could not get them. When the records custodian attempted to comply with the instructions, she discovered that Ms. Lambert's hospital records were missing.

19

The records had last been seen in the Hospital two or three days prior to March 5, 1985, sitting in Dr. Pace's box awaiting dictation of Ms. Lambert's discharge summary. Upon discovery that the chart was missing, the Hospital set about reconstructing the file by gathering copies of items from the various medical departments within the Hospital. When reconstructed, the chart was incomplete, lacking the medical history or physical assessment taken by Dr. Collins on Ms. Lambert's admission to the Hospital on February 2, and the "nurses' progress notes" compiled during Ms. Lambert's hospitalization from February 2 through the morning of February 4 when Ms. Lambert was transferred to St. Dominic Hospital. One of the "nurses' progress notes" contained the ICU nurse's observations of Ms. Lambert from 10:00 p.m. on February 3 until 1:30 a.m. on February 4.

This issue concerns what the jury was entitled to hear and what instruction should have been given regarding the reconstructed medical records. The jury was entitled to be told the original hospital record would not be produced in court, as that was a relevant fact. The hospital had the duty to give an adequate explanation for the absence of the original hospital record. Therefore, the jury was entitled to be told *why* the original hospital record was missing, also a relevant fact.

As with any other evidence, the explanation for the original record's absence may be fully satisfying either that it was lost through no fault of the hospital, that the hospital deliberately destroyed it, or as in most cases, somewhere in between, thereby making it a jury issue. For example, where the evidence is positive that the hospital had been destroyed by fire, such circumstance would adequately account for the loss of the original medical record without fault attributable to the hospital, and there would be no reason for the jury to be instructed on a presumption or inference arising from the loss.

On the other hand, where the evidence is positive that the hospital deliberately destroyed the original medical record or where a record required by law to be kept is unavailable due to negligence, an inference arises that the record contained information unfavorable to the hospital, and the jury should be so instructed. This is precisely the situation when a patient claims the medical privilege and prevents his physician from testifying in court. ***Pittman v. Mendenhall-Mims Mitchell Funeral Home, Inc.,*** 242 Miss. 877, 137 So.2d 518 (1962). Likewise, where the evidence is somewhere in between such that the jury could find that the hospital either had or had not deliberately or

negligently destroyed the original medical record, the jury should be instructed to take this into account.

Thus, where the evidence regarding the missing original medical records is such that the jury is entitled to an instruction, the instruction should require the jury to first determine whether reasonable explanation for the loss of the missing original medical record has been presented by the hospital. Should the jury determine from the explanation provided that the loss of the original medical record was not in any way attributable to the deliberate or negligent actions of the hospital, the jury could not infer that the missing original medical record contained information unfavorable to the hospital. However, should the jury determine from the explanation provided that the loss of the original medical record was deliberately or negligently brought about by the actions of the hospital, the jury could infer that the missing original medical record contained information unfavorable to the hospital.

*DeLaughter*, 601 So.2d at 821-22. Thus, this Court found that the actions of the hospital employees caused the relevant medical records to be lost or destroyed, and that the hospital records were not fully reconstructed; therefore, the trial court erred in failing to place the burden on the hospital to demonstrate that the hospital had not lost or destroyed the records, and the trial court further erred in failing to give a spoliation of evidence instruction. *Id.* at 823.

¶33. Turning to today's case, Richardson submitted jury instruction P-16, a spoliation of evidence instruction, for consideration by the trial court because Norfolk Southern never recovered the train's event recorder. However, the facts of this case do not create the legal presumption that the information on the lost or destroyed event recorder would have been unfavorable to Norfolk Southern. Indeed, the facts in this case pale in comparison to the negligent or intentional actions of the casino in *Thomas* and the hospital in *DeLaughter*.

21

Succinctly stated, there was considerable testimony concerning Norfolk Southern's efforts to recover this event recorder. Likewise, the record reveals that the locomotives pulling the train involved in the collision with Mikie's vehicle were Union Pacific locomotives. While the Norfolk Southern officials were finally able to recover from the Union Pacific officials the event recorder printouts from the event recorder in the second locomotive, efforts to secure or download any information from the lead locomotive were unsuccessful. The evidence at trial revealed that the lead locomotive evidently was not even equipped with an event recorder. Norfolk Southern clearly met its burden of showing that it (Norfolk Southern) did not lose or destroy the event recorder. The record is absolutely devoid of any evidence that Norfolk Southern in any way intentionally, or even negligently, destroyed evidence in its possession.

¶34. For these reasons, we find that the trial court did not commit error in refusing Richardson's spoliation of evidence jury instruction; therefore, this issue is without merit.

**CONCLUSION**

¶35. We are certainly not unmindful of the tragedy of this case – the death of a sixteen-year old child, which unquestionably has brought unimaginable grief to Mikie's family and friends. This Court, however, must apply basic tort law principles such as duty, breach of duty, proximate causation and damages. Even when damages are unquestionably proven, we still must first decide the issue of liability. We are thus constrained as a matter of well-established law to find that the trial court committed no error in its rulings (1) that certain

22

state tort claims asserted by Richardson were preempted by federal law; (2) that evidence of other accidents at the railroad crossing was inadmissible; and, (3) that certain jury instructions submitted by Richardson must be refused. For these reasons, we affirm the final judgment in favor of Norfolk Southern as entered by the Circuit Court of Alcorn County.

¶36. **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**