ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Edward Payton appeals the decision of the Harrison County Circuit Court which upheld a decision of the Mississippi Gaming Commission denying Payton’s argument that his due-process rights were violated because he was not allowed to participate in a Biloxi casino’s slot machine jackpot. The Gaming Commission ruled that Payton was entitled to $20 rather than a prize up to a progressive jackpot of nearly $2.2 million. His sole argument on appeal is a “botched investigation” by the Gaming Commission denied him due process of law and a chance at the jackpot.
 

 ¶ 2. Finding no error in the circuit court’s judgment, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. Payton was playing the Millionaire Blazing Sevens slot machine
 
 [1]
 
 at Boom-town Casino in Biloxi, Mississippi, on February 14, 2004. The machine was manufactured by co-defendant, Bally Gaming and Systems, a Nevada corporation, which also operated the progressive system to which the Millionaire Blazing Sevens machine was connected. The machine hit a combination of three Blazing Red 777s. This combination placed the machine into the bonus feature that would allow Payton to compete for a progressive prize of from $5 up to nearly $2.2 million.
 
 [2]
 
 The bonus-round music started playing, but the spin bonus-game button was not lit. Payton tried to take his bonus spin, but the machine was locked up. Payton asked his female friend, who was with him, to go get a Boomtown employee, but one arrived before she could get back. Both Boom-town and Bally personnel were called to fix the machine and were unsuccessful. Gaming Commission personnel were called to the machine. However, all attempts to fix the machine were unsuccessful. Boom-town offered Payton the opportunity to try winning at another progressive machine. Payton declined the offer and told Gaming Commission personnel that he would be satisfied with a $10,000 prize.
 
 [3]
 
 The Gaming Commission declined Payton’s offer.
 

 ¶ 4. Gaming Commission agent Steve McComb and his supervisor Dave King-man determined that an investigation by the Gaming Commission should be performed at the Gaming Commission laboratory in Biloxi. To accomplish this, the slot machine’s central processing unit (CPU) was removed and taken to the lab. Boom-town cut the power to the errant machine and put it where it could not be played by
 
 *971
 
 patrons. When the CPU was removed the integrity tape, which is affixed to each machine by the Gaming Commission, was still intact showing that no tampering with the machine had occurred.
 

 ¶ 5. As noted by the Gaming Commission hearing examiner Joan Myers in her opinion:
 

 Most slot machine players are unaware of the fact that the spinning reels are simply for entertainment. The outcome of the game is determined by the computer program of the slot machine long before the reels spin and stop. That outcome is stored in the Random Access Memory (RAM) of the machine for a certain period of time and can be later retrieved. This RAM in Payton’s case is on a chip that is on the CPU.
 

 ¶ 6. Gaming Commission Senior Engineer Ames Kerley conducted the investigation of the slot machine’s CPU at the lab. He was able to download the slot machine information to a laboratory computer. He prepared a report to the Gaming Commission in which he said that he was not able to determine what caused the machine to lockup. He listed the cause of the lockup as “indeterminate at this time.” Kerley’s report noted that Bally said that its “preliminary findings show that the lockup is due to a bug with systems communications that is not handled properly within their main program code.” Although the cause of the lockup was not determined, Kerley was able to determine what Payton would have won had the slot machine not failed to activate the bonus feature. Kerley said that he was able to verify that the machine would have made four re-spins and that would mean that the amount chosen by the random value feature was 80 credits, which would be the equivalent of $20. Buttressing its finding, the Gaming Commission report noted that its investigation found that there was no evidence that the progressive jackpot or a large jackpot was hit during the time when Payton was playing, nor did Bally or Boomtown report large jackpots during this time.
 

 ¶ 7. Based upon the evidence of his agents and of the diagnostic testing on the computer game board at the lab, Larry Gregory, Executive Director of the Gaming Commission advised Payton in an April 19, 2004 letter that the slot machine had malfunctioned when Payton attempted to play the bonus round. However, because the Gaming Commission’s investigator was able to download and analyze the slot machine’s CPU, the investigator was able to determine that had Payton been allowed to play the bonus round, he would have re-spun four times and won 80 credits or $20 in the bonus round. He offered Payton $20. The executive director found no basis on which to award Payton $10,000. Pay-ton rejected the $20 payment and requested and received a hearing before a Gaming Commission hearing examiner.
 
 [4]
 

 ¶ 8. The hearing was conducted by hearing examiner Myers on November 3 and 4, 2004, and consisted of 405 pages of testimony and approximately 200 pages of exhibits. By the time of the hearing, Payton had modified his claim, declining to state a
 
 *972
 
 specific amount; instead, he asserted that it was not possible to determine what the outcome of the bonus feature would have been, but he could possibly be entitled to the total of the progressive jackpot.
 

 ¶ 9. Payton testified on his own behalf and called as his expert, Desmond Lad-ner,
 
 [5]
 
 a recently involuntarily separated employee of the Gaming Commission. Payton also called Agent McComb. Bally called McComb and Jeffery Lester, a Boomtown employee who was a slot floor supervisor on the date of Payton’s gaming misadventure, and Bally recalled Ladner as a witness. Ladner testified that he had been Kerley’s boss for approximately eight years and that he had full confidence in Kerley’s ability and skill.
 

 ¶ 10. The conclusion reached by the hearing examiner was that the evidence supported a finding that Payton did not win a primary progressive jackpot; instead, he was entitled to the $20 which the lab report found that he would have won. Hearing examiner Myers issued a sixteen-page ruling in which she reviewed the evidence. Based upon the evidence of the lab report, which was not refuted by Pay-ton, the hearing officer found that “[t]he re-spinning of the reels and the lighting of the bars are merely visual effects, however, and have no part in determining the outcome of the bonus feature, as the value of the bonus award is randomly chosen from the available range of awards
 
 before
 
 the re-spins of the bonus feature begin.” All slot machines in casinos under the jurisdiction of the Gaming Commission must be electronic in their design and operation, and the outcome of each play of a machine must be determined by a random-selection process. Miss. Gaming Reg. IV § E. Further she found that the opening and closing of the slot-machine doors by slot technicians did not make any difference regarding what the random-number generator selected as the outcome of the play; that is because a Commission regulation requires that the game memory stay intact regardless of what happens to the outside of the slot machine like a power on and power off or an opening and closing of the machine in order to correct a possible tilt. The bottom line she said was that the random-number generator had already selected the outcome of Pay-ton’s game, and it was in the memory in the CPU that was taken to the lab. Although the machine locked up, it had already generated Payton’s game outcome, which Kerley was able to extract from the CPU data, and the outcome was that Pay-ton would have made four re-spins and won 80 credits or $20.
 

 ¶ 11. The Gaming Commission adopted the hearing officer’s decision, and Payton appealed to the Circuit Court of Harrison County. Following a hearing, the circuit court sitting in its appellate capacity, upheld the Gaming Commission’s decision. It is from this judgment that Payton appeals.
 

 STANDARD OF REVIEW
 

 ¶ 12. Payton argues that our review should be de novo citing
 
 Tucker v. Hinds County,
 
 558 So.2d 869, 872 (Miss.1990). However, by statute the appellate court “must not” conduct a trial de novo, but it is confined in its review to the record as made below. Miss.Code Ann. § 75-76-
 
 *973
 
 171(2) (Rev.2009). Mississippi Code Annotated section 75-76-171(3) (Rev.2009) sets out our deferential standard of review as follows:
 

 (3) The reviewing court may affirm the decision and order of the commission, or it may remand the case for further proceedings or reverse the decision if the substantial rights of the petitioner have been prejudiced because the decision is:
 

 (a) In violation of constitutional provisions;
 

 (b) In excess of statutory authority or jurisdiction of the commission;
 

 (c) Made upon unlawful procedure;
 

 (d) Unsupported by any evidence; or
 

 (e) Arbitrary or capricious or otherwise not in accordance with law.
 

 ¶ 13. Our function at the appellate level is to review the Gaming Commission’s record and decision to determine if there is any evidence to support the Gaming Commission’s order.
 
 Miss. Gaming Comm’n v. Freeman,
 
 747 So.2d 231, 24(M1 (¶¶40-42) (Miss.1999).
 

 CASINO PATRON’S DISPUTES
 

 ¶ 14. The Mississippi Gaming Control Act established a procedure for resolving disputes between a casino patron and gaming licensee. Where the patron’s dispute involves $500 or more, the casino is’ required to notify the executive director of the Gaming Commission immediately. Miss.Code Ann. § 75-76-159 (Rev.2009). By statute the executive director “shall conduct whatever investigation is deemed necessary and determine whether payment should be made.”
 
 Id.
 
 at (1). Either the patron or the licensee may then file a petition with the Gaming Commission requesting a hearing to reconsider the executive director’s decision. Miss.Code Ann. § 75-76-161 (Rev.2009). The Gaming Commission, in turn, appoints a hearing officer to conduct a hearing on the patron’s dispute.
 
 Id.
 
 The party seeking reconsideration bears the burden of showing that the executive director’s decision should be reversed or modified.
 
 Id.
 
 Any person aggrieved by the hearing officer’s decision may request a hearing with the Gaming Commission to reconsider the ruling. Miss.Code Ann. §§ 75-76-119 (Rev.2009) & 161. However, the Gaming Commission may decide to adopt the hearing officer’s decision as the final order of the Gaming Commission.
 
 Id.
 

 ¶ 15. The final decision of the Gaming Commission may be appealed by filing a petition for judicial review in the circuit court of the county in which the dispute between the gaming licensee and the patron arose, in this case Harrison County. Miss.Code Ann. § 75-76-167 (Rev.2009). The review by the circuit court is conducted without a jury and must not be tried de novo, but it is confined to the record on review. Miss.Code Ann. § 75-76-171(2).
 

 WHETHER PAYTON’S DUE-PROCESS RIGHTS WERE VIOLATED BY A “BOTCHED INVESTIGATION” BY THE GAMING COMMISSION
 

 ¶ 16. Payton’s sole issue on appeal is that his due-process rights were breached by what he termed a “botched investigation” by the Gaming Commission. He makes this argument alleging that there was a spoliation of evidence for the first time on appeal as noted by the circuit court. An issue not raised before the lower court is deemed waived and is procedurally barred.
 
 A-1 Pallet Co. v. City of Jackson,
 
 40 So.3d 563, 570 (¶ 24) (Miss.2010). Procedural bar notwithstanding, we will address Payton’s arguments.
 

 ¶ 17. Payton made much of the fact that the door on the slot machine was opened and closed several times by the different technicians as they tried to fix
 
 *974
 
 the machine. This was done by technicians who had successfully used the open- and-close procedure before to correct a tilt on a machine thinking that perhaps the machine was in a tilt mode. Also, the technicians tried to get the machine to work by powering it down and then back up, but this maneuver also failed. The door was opened and closed also as the technicians checked for bent or broken pins in the CPU. The hearing examiner discounted the possibility that the openings and closings and powerings up and down affected the machine. The brains of the machine were in the CPU, which the investigating Gaming Commission agent testified had retained its integrity tape and remained inviolate.
 

 ¶ 18. Payton also argues that spoliation could have occurred when the CPU was taken by Agent McComb to his house and locked into a desk drawer instead of taking it to an evidence locker or vault. The problem with this argument is that it was Payton’s burden to show that there was “an indication or reasonable inference of probable tampering with the evidence or substitution of evidence.”
 
 Ellis v. State,
 
 934 So.2d 1000, 1005 (¶¶ 20-22) (Miss.2006). Although Payton argued that something
 
 could
 
 have occurred when Agent McComb took the CPU home in a sealed evidence bag, Payton wholly failed to offer any evidence that something
 
 did
 
 happen. Therefore, we find this argument is without merit.
 

 ¶ 19. Payton’s position is not that he won the progressive jackpot and was denied the payment of it. Instead, he claims that he is entitled to the jackpot because his due-process rights were violated. The violation he claims was that the evidence was not property preserved — an argument we rejected — and because the investigation was not properly done. In support of this argument he cites
 
 Grand Casino Biloxi v. Hallmark,
 
 823 So.2d 1185 (Miss.2002). However, the case is factually different from what occurred in Payton’s case. In
 
 Hallmark,
 
 the due-process violation was found after a showing that Grand Casino had destroyed certain evidence, and the Gaming Commission had performed an improper investigation. The machine in
 
 Hallmark
 
 gave indications that the Grand Bucks had been won by Hallmark.
 
 Id.
 
 at 1186 (¶¶ 4-5). Here Payton at no time was under the impression that he had won a jackpot. In
 
 Hallmark,
 
 Hallmark requested the involvement of the Gaming Commission, which Grand Casino discouraged, and their employees instead opened the slot machine and spun the reels and removed them from the machine.
 
 Id.
 
 Pay-ton did not request the help of the Gaming Commission; instead, it became involved at the behest of Boomtown. No employees of Boomtown removed any part of the machine Payton was playing prior to the arrival of the Gaming Commission. A representative of Bally opened the machine to check for broken or bent pins, but seeing that the pins were okay, he closed the machine. Agent McComb immediately had the video of what had occurred at the machine saved, and the video was entered before the hearing examiner. In
 
 Hallmark,
 
 most of the video of the employees’s actions were recorded over or erased.
 
 Id.
 
 at (¶ 5). In Payton’s case, Agent McComb prepared his own report of his interviews and activities, and he had the witnesses give handwritten statements regarding what they observed and did. In
 
 Hallmark,
 
 the agents did not document any interviews not even with Hallmark.
 
 Id.
 
 at 1189-90 (¶ 19). What is shown by the evidence is that the casino and the Gaming Commission followed the gaming rules to the letter for conducting a patron’s complaint to the letter.
 

 ¶ 20. Our review of the record finds that Payton received due process. He was
 
 *975
 
 given a notice and an opportunity to be heard at a two-day hearing. Further there was an appeal to the circuit court at which he gave further argument of his version of the case, and then he appealed that judgment.
 

 ¶ 21. Applying our deferential standard of review, we affirm the judgment of the circuit court, which upheld the Gaming Commission’s decision finding that Payton was entitled to $20.
 

 ¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ISHEE AND CARLTON, JJ„ CONCUR. MAXWELL, J., NOT PARTICIPATING.
 

 [1]
 

 .The Millionaire Sevens is a twenty-five-cent denomination wide-area progressive machine. A wide-area progressive machine is one which is a part of a network of gaming establishments that features a jackpot that increases with the play of machines in the network. The slot machine Payton played contained three reels, one payline, and a maximum of four coins. The bonus round was activated when four coins were bet and three red 777s showed on the payline.
 

 [2]
 

 . The progressive jackpot was $2,189,092 when play stopped on the slot machine that Payton was playing. Payton's own expert testified that the chance of Payton hitting the nearly $2.2 million dollar prize was statistically "one in one million.”
 

 [3]
 

 . Nowhere in the record is it indicated that $10,000 was a valid payout with the combination that was showing on the slot machine. Apparently, the figure was one which Payton himself determined would be a satisfactory settlement amount.
 

 [4]
 

 . An aggrieved patron can then request a reconsideration of the executive director’s decision at which point the Gaming Commission shall appoint a hearing examiner to conduct a hearing. Miss. Code Ann. § 75-76-161(1)(6) (Rev.2009). After the hearing, the Gaming Commission may then review the hearing examiner's decision and may reverse, modify, or affirm the decision. Miss.Code Ann. § 75-76-119 (Rev.2009). In accordance with its rule-making authority, Mississippi Code Annotated section 75-76-33(2)(e) (Supp. 2010), the Gaming Commission has adopted rules outlining how a patron's appeal is to be conducted. Rule H, entitled Player Disputes, sets out in eighteen sections how the hearing will be conducted. Miss. Gaming Comm’n Reg. (H)(§§ 1-18).
 

 [5]
 

 . Ladner was terminated from employment as laboratory supervisor of the Gaming Commission’s Biloxi lab just three weeks after the lab report on Payton's investigation was released. Interestingly, Payton’s investigation was begun during the time Ladner was still director of the Biloxi gaming lab, and he signed a copy of the final investigation report. He took pains at the hearing to explain that he did not actually sign the document itself, but his signature was placed there at his direction by someone else.